**HEADWATERS FOREST DEFENSE, Plaintiff,**

and

**Molly Burton; Vernell "Spring" M. Lundberg; Michael McCurdy; Eric Samuel Neuwirth; Maya Portugal; Lisa Marie Sanderson–Fox; Jennifer Schneider; Terri Slanetz; Noel Tendick, Plaintiffs–Appellants,**

v.

**The COUNTY OF HUMBOLDT, a political subdivision of the State of California; Humboldt County Sheriff's Department; Dennis Lewis, Sheriff;**

Gary Philip, Chief Deputy; Marvin Kirkpatrick, Deputy; John Sylvia, Deputy; Ciarbellini, Sgt.; City of Eureka, a political division of the State of California; Eureka Police Dept; Bill Honsal, Captain; James Manos, Sgt., Defendants–Appellees.

No. 98–17250.

United States Court of Appeals,
Ninth Circuit.

Filed Jan. 11, 2002
Amended Jan. 30, 2002.

Mark Hughes, Denver, Colorado, for the plaintiffs-appellants.

Nancy K. Delaney, Eureka, California, for the defendants-appellees.

Margaret C. Crosby, for amicus curiae, American Civil Liberties Union Foundation of Northern California.

Before: BRIGHT,[1] PREGERSON, and W. FLETCHER, Circuit Judges.

PREGERSON, Circuit Judge:

Nine environmental activists and an environmental group brought this action, under 42 U.S.C. § 1983, against the County of Humboldt, the Humboldt County Sheriff's Department, Eureka City and its police department, and several individual officers, alleging that the officers' use of pepper spray on the activists' eyes and faces during three peaceful protests constituted an excessive use of force in violation of their Fourth Amendment rights. We previously issued an opinion, which is reported at 240 F.3d 1185 (9th Cir.2001), in which we reversed the district court's decision to grant summary judgment on qualified immunity grounds to Humboldt County Sheriff Dennis Lewis ("Lewis") and Chief Deputy Sheriff Gary Philip ("Philip"), the defendants who initially authorized the use of the pepper spray on the nonviolent protestors. We also reversed the district court's decision to enter judgment in favor of Humboldt County, the City of Eureka, and their respective police departments following trial and a hung jury.

The Supreme Court granted certiorari, vacated our judgment, and remanded this case to us for further consideration in light of *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), in which the Supreme Court describes the way in which to proceed when state officials assert qualified immunity in a § 1983 excessive force action. Having reviewed the facts and circumstances of this case in light of *Saucier*, this panel reaffirms its conclusion that Lewis and Philip are not entitled to qualified immunity.[2]

## I. Background

The facts of this case can be found in our prior opinion, at 240 F.3d at 1191–96, and are repeated here only to the extent necessary to undertake the qualified immunity analysis "in light of the specific context of the case," *Saucier*, 121 S.Ct. at 2156.

During three nonviolent protests against the logging of ancient redwood trees in the Headwaters Forest, plaintiffs-appellants ("protestors") linked themselves together with self-releasing lock-down devices known as "black bears." A "black

---

1. The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

2. The Supreme Court's remand does not require us to reconsider our decision to reverse the district court's entry of judgment in favor of Humboldt County, the City of Eureka, and their respective police departments.

bear" is a cylinder with a rod or post welded into the center. The protestors placed their arms into the steel cylinders and attached steel bracelets worn around their wrists to the center rods or posts in the "black bears" by using mountain climbers' carabiners. When in place, the devices immobilized their arms and prevented their separation, although the protestors could disengage themselves from the devices by unclipping the carabiners from inside the cylinders. From 1990 until the fall of 1997, defendants had forcibly, but safely, removed hundreds of "black bears" from protestors' arms by cutting the cylinders with a hand-held electric grinder.

Beginning in the fall of 1997, defendants began using olesoresin capsicum aerosol ("OC" or "pepper spray") to cause the protestors to release themselves from the "black bears." The use of pepper spray under these circumstances was entirely unprecedented: in California, its use was "limited to controlling hostile or violent subjects" and it had never been used in Humboldt County, the State of California, or anywhere in the country against non-violent protestors.

At issue in this case are three protests that occurred in the fall of 1997, in which defendants used pepper spray on the protestors, and then refused to give them water to wash out their eyes, in order to force the protestors to release themselves from the "black bears."

During the first protest, held indoors at the headquarters of the Pacific Lumber Company, seven protestors were linked together with "black bears." Officers from the Humboldt County Sheriff's Department warned that pepper spray would be used if the protestors did not release. After the protestors refused to release, the officers forced four of the protestors' heads back and applied pepper spray with a Q-tip to the corners of their closed eyes.

The three protestors who had not received the pepper spray voluntarily released. The officers then reapplied the pepper spray with Q-tips to the eyelids of the four protestors who remained in the "black bears." The four protestors still did not release. Twenty minutes after the pepper spray was first applied and six minutes after its second application, the officers sprayed water into the eyes of the four protestors to dilute the pepper spray, continuing to do so periodically for more than an hour. Thereafter, the officers carried the four protestors out of the building on stretchers. It took two officers just six minutes to carry the protestors out of the building. Once outside the building, one pair of protestors voluntarily released. An officer used an electric grinder to extricate the other pair from the "black bears." It took ten minutes to remove the device by grinder. No pain or injury was inflicted on the protestors by the grinder.

During the second protest, outdoors on Pacific Lumber Company property, two pairs of protestors, also linked together with "black bears," were warned that pepper spray would be used if they did not release. Two of the protestors released themselves from the "black bears" and two refused. An officer then applied the pepper spray with a Q-tip to the corners of the closed eyes of the protestors who remained in the "black bears." Despite the protestors' pleas for water to flush the pepper spray out of their eyes, one of the officers can be heard on videotape saying that they will only be given water if they release and that the pain will only get worse in thirty seconds when he sprays pepper spray in their faces. A minute later, the officer sprayed pepper spray directly into both of the protestors' faces in short full bursts from inches away. Five minutes later, the protestors again refused to release. Thereafter, officers sprayed water from hand-held spray bottles into the

protestors' faces and used an electric grinder to cut the protestors out of the "black bears." No pain or injury was inflicted by the grinder.

In the third protest, four protestors linked themselves together in a Congressman's office using "black bears." After officers warned the protestors that pepper spray would be used if they did not voluntarily release, the officers pulled back each of the protestors' heads and applied pepper spray to their eyes with a Q-tip. One protestor, who was a minor, testified at trial that one of the officers pried open her eyes and applied pepper spray directly on them. Seven minutes after the initial application of pepper spray, one of the officers told the protestors that water would be provided if the protestors released themselves from the "black bears." Two of the protestors released and two remained attached to each other. One officer then stood within a foot of one of the two attached protestors and sprayed pepper spray directly at her face. Within three minutes, the remaining two protestors released. The officers then offered water from spray bottles to wash the pepper spray off the protestors' faces.

The district court granted summary judgment on qualified immunity grounds in favor of all individual defendants except for Lewis and Philip. At the close of plaintiffs' case-in-chief, the district court ruled that Lewis and Philip were also entitled to qualified immunity and dismissed the case against them. The jury deadlocked on the remaining claims against Humboldt County, the City of Eureka, and their respective police departments. The district court declared a mistrial and set a new trial date. Eight weeks later, the district court reversed itself and granted Humboldt County, the City of Eureka, and their respective police departments judgment as a matter of law.

## II. Analysis

■ Under the qualified immunity doctrine, "government officials … generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). Prior to the Supreme Court's decision in *Saucier v. Katz*, we had held that "the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim." *Katz v. United States*, 194 F.3d 962, 968 (9th Cir.1999) (citations omitted).

■ In *Saucier*, the Supreme Court instructs that these inquiries are distinct. In order to decide whether state officers are entitled to qualified immunity, *Saucier* instructs that we must first determine whether, "[t]aken in the light most favorable to the party asserting the injury … the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 121 S.Ct. at 2156. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established … in light of the specific context of the case" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

We concluded in our prior opinion that, viewing the evidence in the light most favorable to the protestors, a rational juror could conclude that the use of pepper spray against the protestors constituted excessive force and that Lewis and Philip were liable for the protestors' unconstitu-

tional injury. 240 F.3d at 1199–1209. This analysis is consistent with *Saucier*'s first inquiry: viewing the facts in the light most favorable to the protestors, Lewis and Philip violated the protestors' Fourth Amendment right to be free from excessive force.

 Having answered *Saucier*'s first question in the affirmative, we turn to *Saucier*'s second inquiry, and conclude that it would be clear to a reasonable officer that using pepper spray against the protestors was excessive under the circumstances. The Fourth Amendment permits law enforcement officers to use only such force to effect an arrest as is "objectively reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citations omitted). "[T]he essence of the *Graham* objective reasonableness analysis" is that " '[t]he force which was applied must be balanced against the *need* for that force: it is the need for force which is at the heart of the *Graham* factors.' " *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir.1997) (quoting *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir.1994)) (emphasis in original). The facts reflect that: (1) the pepper spray was unnecessary to subdue, remove, or arrest the protestors; (2) the officers could safely and quickly remove the protestors, while in "black bears," from protest sites; and (3) the officers could remove the "black bears" with electric grinders in a matter of minutes and without causing pain or injury to the protestors.

Defendants asserted at trial that the protestors' use of "black bears" constituted " 'active' resistance to arrest,' " meriting the use of force. The Eureka Police Department defines "active resistance" as occurring when the "subject is attempting to interfere with the officer's actions by inflicting pain or physical injury to the officer without the use of a weapon or object." 240 F.3d at 1202–3. Characterizing the protestors' activities as "active resistance" is contrary to the facts of the case, viewing them, as we must, in the light most favorable to the protestors: the protestors were sitting peacefully, were easily moved by the police, and did not threaten or harm the officers. In sum, it would be clear to a reasonable officer that it was excessive to use pepper spray against the nonviolent protestors under these circumstances.

Defendants' repeated use of pepper spray was also clearly unreasonable. As we recently concluded, the use of pepper spray "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, *any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.*" *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir.2000) (emphasis supplied). Because the officers had control over the protestors it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control, and even *less* necessary to *repeatedly* use pepper spray against the protestors when they refused to release from the "black bears." It also would have been clear to any reasonable officer that the manner in which the officers used the pepper spray was unreasonable. Lewis and Philip "authorized full spray blasts of [pepper spray], not just Q-tip applications," despite the fact that the manufacturer's label on the canisters of pepper spray defendants used " 'expressly discouraged' spraying [pepper spray] from distances of less than three feet." 240 F.3d at 1195, 1208.

Finally, it would have been clear to any reasonable officer that defendants' refusal to wash out the protestors' eyes with water constituted excessive force under the circumstances. As we noted in *LaLonde*—when determining that the law had been

clearly established by a date that is prior to the time the pepper spray was used on the protestors—"any reasonable officer would know that ... a refusal without cause to alleviate [pepper spray's] harmful effects constitutes excessive force." *La-Londe,* 204 F.3d at 961. In two of the protests, officers threatened that they would not provide the protestors with water to wash out their eyes until they released themselves from the "black bears," and in one of the protests, the officers did not provide the protestors with water for over twenty minutes. Spraying the protestors with pepper spray and then allowing them to suffer without providing them water is clearly excessive under the circumstances.

We are not prevented from denying defendants qualified immunity merely because no prior case prohibits the use of the precise force at issue in this case. In the first instance, the circumstances of *La-Londe,* although not identical to those in this case, are "not distinguishable in a fair way from the facts presented in the case at hand" such that their results should be different. *Saucier,* 121 S.Ct. at 2157. In addition, regional and state-wide police practice and protocol clearly suggest that using pepper spray against nonviolent protestors is excessive. The law regarding a police officer's use of force against a passive individual was sufficiently clear at the time of the events at issue in this case that the defendants cannot claim qualified immunity on the ground that they made a reasonable mistake of law. *See Saucier,* 121 S.Ct. at 2158.

Moreover, in requiring that the law put a government officer "on notice that his conduct would be clearly unlawful" before he could be held liable for violating the Constitution, the Supreme Court emphasized that it was not insisting that "courts must have agreed upon the precise formulation of the standard." *Id.* As we recently noted, a law can be violated "notwithstanding the absence of direct precedent ... [o]therwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle v. Rutherford,* 272 F.3d 1272, 1274–75 (9th Cir.2001) (citation omitted).

Viewing the facts in the light most favorable to the protestors, we conclude that Philip and Lewis are not entitled to qualified immunity because the use of pepper spray on the protestors' eyes and faces was plainly in excess of the force necessary under the circumstances, and no reasonable officer could have concluded otherwise.

## CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment for Lewis and Philip and remand this case for further proceedings consistent with this opinion and with our prior decision to reverse the district court's entry of judgment as a matter of law on behalf of Humboldt County, the City of Eureka, and their respective police departments.