[No. B227812. Second Dist., Div. Eight. May 8, 2012.]

ALMA MENDOZA et al., Plaintiffs and Respondents, v.
CITY OF WEST COVINA et al., Defendants and Appellants.

705

**COUNSEL**

Alvarez-Glasman & Colvin and Roger A. Colvin for Defendants and Appellants.

Samuel O. Ogbogu; Law Office of Robert Schott Shtofman and Robert Scott Shtofman for Plaintiffs and Respondents.

**OPINION**

**RUBIN, Acting P. J.**—The City of West Covina and West Covina Police Officer Enrique Macias appeal from the judgment entered after a jury found that Macias caused the wrongful death of David Mendoza through the unconstitutional use of excessive force while Mendoza was in custody at a hospital. We reject appellants' contentions that Macias was entitled to qualified immunity for his conduct; the jury's verdict was excessive; and an inadvertent instructional error was prejudicial. We therefore affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

David Mendoza, 42, died of asphyxiation on March 17, 2007, while in police custody in the emergency room of Citrus Valley Medical Center, after

he was first repeatedly "Tasered" and punched by West Covina Police Officer Enrique Macias, and then pinned to the ground and handcuffed by Macias and three other West Covina police officers. Mendoza's sons, David, Jr., and Irvin, sued the city and Macias for wrongful death, alleging that Macias used excessive force in violation of their father's constitutional rights.[1] A jury awarded respondents $750,000 each for the wrongful death of their father, but determined that Mendoza was 30 percent at fault in the incident. The jury found that Macias had acted with "malice, oppression and/or fraud." In a bifurcated proceeding before the trial court, the court assessed punitive damages against Macias in the amount of $4,500.

The facts that brought Mendoza into the hospital under police custody are not in dispute. In the days leading up to his death, Mendoza went to the hospital three times because of alcohol withdrawal sickness. The last two hospital visits took place on late night March 15 into early March 16, and late night March 16 into early March 17.[2] On those last two occasions, an intravenous needle was used. On the second, at around 3:30 a.m. on March 17, Mendoza pulled the needle from his arm and walked out of the hospital.

A few hours later, Mendoza walked into the backyard of a nearby home, tried to open a window, and asked in Spanish to use a telephone. The home's owner called the police, who found Mendoza seated on a curb not far away. One of those officers was Macias. Mendoza told Macias that he went to the house to ask if he could use the phone to call his family. Mendoza asked Macias to help him. Macias arrested Mendoza on suspicion of burglary and took him to a holding cell. Mendoza complained that he had stomach pains and was hearing voices, and told Macias that he also had diabetes and high blood pressure. Macias took Mendoza to the hospital so Mendoza could be medically cleared for booking.

Once at the hospital, Mendoza submitted to a physical examination and gave a urine sample. His right arm was then handcuffed to the arm of something called a "BA chair," which was designed as a seat for drawing blood samples for testing blood-alcohol content. Up to this point, from his entry into the backyard through his arrest and transportation to the hospital, Mendoza remained cooperative, nonthreatening, and noncombative. When a nurse applied a tourniquet to Mendoza's arm in order to draw a blood sample, however, Mendoza said he did not want a needle in his arm. From this point on, the events leading to Mendoza's death were very much in dispute at trial. We begin with appellants' version of events.

---

[1] Other named plaintiffs and defendants were removed from this action by way of various pretrial motions. We will refer to David Mendoza, Jr., and Irvin Mendoza collectively as respondents, and to Macias and the City of West Covina collectively as appellants.

[2] Unless otherwise specified, all further date references are to the year 2007.

According to Macias, Mendoza stood up, moved toward the nurse who was applying the tourniquet, and said, "I don't want this," and "I don't want to be here." Macias told Mendoza to relax and sit down. Mendoza complied, but stood up several more times. Although Macias kept telling Mendoza to relax, Mendoza became increasingly agitated and began struggling to get out of the chair.

Paisley Velasquez, a Los Angeles County sheriff's deputy, was also in the emergency room area, and Macias asked her to watch Mendoza while he called his watch commander about Mendoza's conduct. Mendoza rushed out of his chair and moved toward Velasquez, which both Velasquez and Macias considered a threat. Velasquez responded by placing her hands on Mendoza's chest and moving him back against a wall. She claimed Mendoza resisted and kept pushing against her. Macias went back to help Velasquez, and tried to get Macias to sit back down.

Because Mendoza continued to resist, and because Macias believed Mendoza might use the chair to which he was handcuffed as a weapon, Macias decided to use his Taser on Mendoza. Macias warned Mendoza for about 30 seconds that he would "Taser" Mendoza unless he sat back down, and pressed the Taser against Mendoza's torso. When Mendoza did not comply, Macias activated the Taser.[3] Mendoza came toward Macias, and they both fell to the ground. A prolonged struggle followed, during which, according to Macias, Mendoza swung the chair that was handcuffed to his wrist and flipped it from side to side. Mendoza knocked the Taser from Macias's hands, but Velasquez retrieved it and returned it to Macias, who applied it to Mendoza three or four more times in an attempt to subdue him. Mendoza was yelling and screaming and kept grabbing Macias. Macias punched Mendoza in the face five or six times.

In response to Macias's radio call for help, three more West Covina police officers arrived and helped Macias subdue Mendoza. Between the four of them, they rolled Mendoza over on to his stomach, held him down, and handcuffed him. The officers then pulled Mendoza up into a sitting position. A doctor walked by and asked whether Mendoza was breathing. He was not. Efforts to revive him were futile, and Mendoza died.

---

[3] Use of the Taser in this fashion is referred to as "drive mode," as opposed to "dart mode," which involves firing two darts into the body of the person being "Tasered." Drive mode is a lower level of force than dart mode. Although the log from Macias's Taser showed it was used in dart mode at least once, the evidence strongly suggests otherwise. Ultimately, the distinction has no effect on our analysis and we will assume that the Taser was used in drive mode only.

The testimony of various witnesses tells a different version of the events.[4] Macias conceded that between the time he pressed the Taser against Mendoza's body and the first time he fired it, Mendoza did not try to hit him or Deputy Velasquez. Nurse Judi Valenzuela, who had tried to draw blood from Mendoza, testified that Mendoza was seated when Macias first "Tasered" him.

Cristina Madrigal had been brought to the hospital by Deputy Velasquez after being involved in a traffic accident. Madrigal was lying on a gurney in the emergency room.[5] She could not see Mendoza, but was able to overhear what was going on.[6] She heard Macias telling Velasquez that Mendoza had been wandering the streets. She then heard Mendoza refusing something that "they" wanted to give him, and also heard Macias tell Mendoza to calm down and that he would be fine. She then heard the sound of a chair moving around, followed by the snapping sound of a Taser. Mendoza then fell into her view, and from that point on she was able to see what was happening.

Mendoza was facedown on his stomach with his right hand still cuffed to the chair. Madrigal heard him plead numerous times, "Please God, make it stop. Make it stop. Please help me." He was also screaming in pain. Some nurses moved Madrigal, but she was still able to see what was happening to Mendoza. Madrigal never saw Mendoza touch or resist anyone. The only movements Mendoza made were "minimum." He did not appear to be trying to leave or move away. His left hand was by his side and his right hand was out toward the front, still cuffed to the chair. Madrigal never saw Mendoza lift or swing the chair. As Mendoza remained facedown on the floor, one officer had a foot near Mendoza's head and another had a foot on his back. She did not think Mendoza was moving during this time.

Mauro Miranda was Mendoza's brother-in-law. Miranda had been with Mendoza at the hospital the night before when Mendoza went there voluntarily to treat his alcohol withdrawal symptoms. Miranda left before Mendoza wandered off, and returned about 9:30 a.m. to check on Mendoza and see how he was doing. Instead of finding Mendoza in a bed as he had expected, Miranda found Mendoza handcuffed to a chair in Macias's custody.

Miranda approached Mendoza and asked what was happening. He told Macias that he was Mendoza's brother-in-law and Macias told him in a very aggressive tone to get out and go to the police station if he wanted

---

[4] None of the testimony and evidence set forth below was mentioned by appellants in their appellate brief, which, as we discuss later, carries serious consequences for them.

[5] Madrigal was in custody and handcuffed to the gurney. She testified that she was mistakenly arrested and was later released.

[6] Madrigal testified that she was fluent in Spanish.

information. Miranda went out to the waiting area and called a friend to come meet him there. When the friend arrived, Miranda went out to the parking lot to wait with him. Miranda heard someone yelling and saw people gathering outside the emergency room. Miranda ran over to the emergency room entrance and saw Mendoza lying down. Deputy Velasquez had an arm around Mendoza's neck while Macias was on top of Mendoza's right hip. Macias had the stun gun in his left hand and was alternately punching and "Tasering" Mendoza. Miranda did not count how many times Macias punched Mendoza, but he testified that Macias "did not stop from the time that I was there." Miranda estimated that Macias used his Taser on Mendoza five or six times, sometimes for as long as seven seconds. As this was going on, Mendoza moved just a little bit, "like any person that is experiencing some kind of pain. He was jumping and flinching as if he were experiencing pain."

Mendoza yelled to Macias, "Stop it. No more," but Macias continued to punch and "Taser" him. Macias yelled at Mendoza, "Just stop it, you punk." Mendoza was "moving as like when a person . . . is reacting to something and wants to move back." Miranda shouted at Mendoza to stop moving "because the police officer would not stop hitting him or tasing him. The officer wanted him to be completely still. Well, but every time that he would receive a punch or get tased, then he would—his body would move. He would react just—he would react to the punching."

According to Miranda, Mendoza was lying on the floor from the time he walked back in to the emergency room. Mendoza never hit anyone, never tried to take Macias's Taser, and never touched Macias or Velasquez. When asked if Mendoza had lifted up the chair to which he was handcuffed, Miranda said, "No, he was completely subdued." Mendoza cried out for Macias to stop five or six times. After that, he moaned or made only sounds, like "aye, aye" in response to Macias's continued use of force.

By the time the three other officers arrived, Mendoza's movements were a lot weaker and he was only making sounds, Miranda said. The three officers "got on top of [Mendoza] next to the officer on top of him with his stomach and everything." From that point on, Miranda could no longer see Mendoza. The last understandable words he heard Mendoza say were "Stop. No more. That's it."

While all this was going on, Miranda noticed someone using their mobile phone to make a video recording of the incident. That person eventually gave Miranda a copy of the 42-second video, which was played for the jury. The court reporter did not transcribe what was being said on the video because it was unintelligible. Miranda made some attempt to describe what was shown on the recording. Miranda said it showed Macias hitting Mendoza while

Velasquez restrained him. Miranda said he also heard Macias telling Mendoza to calm down, and Mendoza screaming in pain.[7]

Dr. Ronald O'Halloran, a forensic pathologist who is the chief medical examiner for Ventura County, testified for respondents that Mendoza died due to "restraint asphyxiation" from the force of being pinned by Macias and the three other West Covina police officers. After reviewing the autopsy report and other materials, O'Halloran concluded that one officer had a knee between Mendoza's shoulder blades, one had a hand on his head or face, another had a knee near Mendoza's right shoulder, and Macias had Mendoza's left arm behind his back. The stress of being beaten and stunned, combined with Mendoza's obesity and hypertension, made him more susceptible to that form of asphyxiation, O'Halloran testified.

Richard Lichten, respondents' police use of force expert, testified that Macias's initial use of the Taser was unnecessary and excessive because Mendoza had merely expressed his refusal to submit to the intravenous blood draw and was not making any threatening moves. Even if the initial Taser use had been proper, everything that happened after that was not, Lichten said. First, according to Lichten, the computerized log from the Taser Macias used showed excessive force because it was discharged 14 times, with one discharge lasting upwards of 30 seconds.[8] Second, Macias was the officer in charge of the situation and was required to direct the other officers and make sure that they were keeping Mendoza's airway open so he could breathe. According to Lichten, there was no evidence that Macias took such steps.

Appellants contend on appeal that they are shielded from liability because Macias's use of force was entitled to qualified immunity. As a result, they contend the trial court erred by denying their motion for nonsuit on that ground. They also contend that a new trial is warranted because there is insufficient evidence to support the jury's combined damage award of $1.5 million. Finally, they contend the trial court erred because an instruction that the court had refused found its way into the packet of instructions inside the jury room, and that the error was not cured even though it was discovered before a verdict was reached and the jury was instructed to disregard the instruction.

---

[7] Although the videotape was seen by the jury and was in evidence at the trial, appellants did not designate the video as part of the record on appeal, and their appellate briefs never mention its existence.

[8] There was contrary evidence that the stun gun's log was not functioning properly and therefore did not accurately reflect the number of times and length of discharges by Macias during his encounter with Mendoza. This, of course, created a conflict in the evidence for the jury to resolve.

## DISCUSSION

1. *Appellants Are Not Entitled to Qualified Immunity*

    A. *The Qualified Immunity Doctrine*

    ■  Respondents sought wrongful death damages through a civil rights cause of action under title 42 United States Code section 1983 (section 1983), which provides that every person who, under color of statute, deprives a citizen of his rights pursuant to the United States Constitution or federal law, shall be liable in an action at law. The United States Supreme Court has created a qualified immunity for public officers who are defendants in such actions. (*Venegas v. County of Los Angeles* (2007) 153 Cal.App.4th 1230, 1241–1242 [63 Cal.Rptr.3d 741].)

    The qualified immunity rule shields public officers from section 1983 actions unless the officer has violated a clearly established constitutional right. This turns on a determination of whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted. (*Saucier v. Katz* (2001) 533 U.S. 194, 202 [150 L.Ed.2d 272, 121 S.Ct. 2151] (*Saucier*).) Because the rule supplies an immunity from suit instead of a mere defense to liability, its protections are partially lost if a case goes to trial, and the issue should therefore be resolved at the earliest possible stage. (*Pearson v. Callahan* (2009) 555 U.S. 223, 232 [172 L.Ed.2d 565, 129 S.Ct. 808] (*Pearson*).)

    ■  The *Saucier* court established a two-step procedure for determining whether a defendant's conduct was entitled to qualified immunity. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (*Saucier, supra,* 533 U.S. at p. 201.) "If no constitutional right would have been violated were the allegations established," then the qualified immunity inquiry ends. (*Ibid.*) However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad, general proposition . . . ." (*Ibid.*)[9]

    ■  Determining whether a plaintiff's constitutional rights were violated by the use of excessive force involves several factors. First, we consider the

---

[9] The *Saucier* court made its two-step procedure mandatory, but the *Pearson* court held the procedure was instead discretionary, leaving it to individual trial courts to determine which prong of the inquiry should be tackled first. (*Tortu v. Las Vegas Metropolitan Police Dept.* (2009) 556 F.3d 1075, 1085, fn. 7.) Otherwise, however, *Pearson* did not alter the *Saucier* formulation.

nature and quality of the force used. Next, we consider the governmental interests at stake by looking at (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or trying to evade arrest by flight. The most important of these is whether the suspect posed an immediate threat to the officers or others, as measured objectively under the circumstances. (*Mattos v. Agarano* (9th Cir. 2011) 661 F.3d 433, 441–442 (*Mattos*).)

Whether the right was clearly established turns on whether the case law at the time of the alleged constitutional violation made it sufficiently clear that every reasonable official would have known his conduct violates that right. (*Mattos, supra*, 661 F.3d at p. 442.) This part of the inquiry presents a question of law. (*Tortu v. Las Vegas Metropolitan Police Dept., supra*, 556 F.3d at p. 1085.) If there is no binding precedent, a court should consider whatever decisional law is available, including decisions of state courts, other circuit courts, district courts and even unpublished district court decisions. (*Drummond v. City of Anaheim* (2003) 343 F.3d 1052, 1060 (*Drummond*).)

It is not necessary that the alleged acts of excessive force have been previously held unconstitutional if the unlawfulness was apparent in light of existing law. (*Drummond, supra*, 343 F.3d at pp. 1060–1061.) Otherwise, police officers would escape liability for even the most egregiously excessive uses of force simply because there was no case on all fours prohibiting that precise type of conduct. (*Id.* at p. 1061.)

## B. *Appellants Have Waived Their Qualified Immunity Claim*

Right before jury arguments began, appellants made an oral motion for nonsuit, contending that Macias's use of force on Mendoza was entitled to qualified immunity. The trial court denied that motion, finding that whether Macias used excessive force was a question for the jury to resolve. Appellants contend that the trial court erred.[10]

As noted above, whether qualified immunity applies turns in large part on a factual inquiry. Determining whether a police officer violated the plaintiff's constitutional rights by using excessive force must be evaluated in light of

---

[10] Appellants make passing reference to the need for a new trial, but do not address the contents of their new trial motion, and also fail to analyze or cite relevant authority concerning the grounds for a new trial and why the trial court abused its discretion by denying their new trial motion. To the extent they might contend they are in fact challenging the order denying that motion, we therefore deem the issue waived. (*Said v. Jegan* (2007) 146 Cal.App.4th 1375, 1384 [53 Cal.Rptr.3d 661].) The same is true as to their unsuccessful JNOV (judgment notwithstanding the verdict) motion, which they do not discuss.

facts most favorable to the plaintiff's case. Likewise, when determining whether the constitutional violation was reasonably clear to the officer, the facts must be viewed in the plaintiff's favor.

A defendant is entitled to nonsuit if the trial court determines as a matter of law that the plaintiff's evidence, when viewed most favorably to the plaintiff under the substantial evidence test, is insufficient to permit a jury to find in his favor. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 262–263 [80 Cal.Rptr.2d 196].) We review an order denying a motion for nonsuit by using the same test as the trial court, and will affirm that order so long as there was substantial evidence to support the jury's verdict. (*Ibid.*; *Huber Tool Works, Inc. v. Marchant Calculators, Inc.* (1962) 204 Cal.App.2d 822, 824 [23 Cal.Rptr. 10].) The same is true in the federal courts. (*Starceski v. Westinghouse Electric Corp.* (3d Cir. 1995) 54 F.3d 1089, 1093, fn. 1 [motions for nonsuit and JNOV are both motions for judgment as a matter of law under Fed. Rules Civ.Proc., rule 50(a), 28 U.S.C.]; *Guilloty Perez v. Pierluisi* (1st Cir. 2003) 339 F.3d 43, 50 [substantial evidence standard applies to review of motion for judgment as a matter of law]; *Ortega v. Schramm* (11th Cir. 1991) 922 F.2d 684, 694 [standard of review from district court's order denying defendant's JNOV motion on ground of qualified immunity is same as that of the district court in the first instance; all of the evidence from the trial must be considered in the light most favorable to the party opposed to the motion, and where there was substantial conflicting evidence to support the jury's verdict, the motion should be denied].)

Because the substantial evidence standard applied, appellants were required to present and discuss all the evidence, both favorable and unfavorable, and show why it was insufficient. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737 [69 Cal.Rptr.3d 365] [affirming jury verdict for plaintiff in excessive force case under § 1983].) As alluded to in our statement of facts, appellants have made a completely one-sided presentation of the facts, and then analyzed the qualified immunity issue in light of only those facts.

Although they mention parts of nurse Valenzuela's testimony that favor them, they do not mention her testimony that Mendoza was seated when Macias first "Tasered" him. Similarly, they refer to a snippet of Miranda's testimony—that he saw the three other officers arrive and help Macias restrain Mendoza—but do not mention Miranda's testimony that Macias continued to "Taser" and punch Mendoza even though Mendoza was completely subdued, cried out for help, and made no movements except for flinching in response to pain from the beating he was taking. They do not mention Madrigal's testimony that after Mendoza was "Tasered" for the first time and fell to the floor, he did not resist or touch anyone, did not lift or swing the chair to which he was handcuffed, made only minimal movements,

and repeatedly cried out for help. Nor do they mention the testimony of respondents' use of force expert, who concluded that Macias used excessive force and failed to ensure that Mendoza was restrained in a way that did not impair his breathing. They also failed to mention evidence from the log of Macias's Taser, which showed it had been discharged 14 times for as long as 30 seconds.[11] Finally, appellants omit any reference to the videotape of the incident that the jury saw.

As a result, we deem waived appellants' challenge to the trial court's order denying their nonsuit motion. (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 [99 Cal.Rptr.3d 158]; *Schmidlin v. City of Palo Alto, supra,* 157 Cal.App.4th at p. 738.) In the next part, we alternatively hold on the merits that Macias's conduct was not entitled to qualified immunity.

### C. *Even on the Merits, Macias's Conduct Was Not Qualifiedly Immune*

Appellants contend that both prongs of the qualified immunity doctrine protected Macias's conduct because his use of force was not excessive and because his conduct did not violate a clearly established right. In particular, they focus on Macias's use of his fists and Taser to subdue Mendoza, who was purportedly struggling with Macias and whipping about the chair to which he was handcuffed as if it were a weapon. They also try to distance themselves from Macias's role in the conduct that most directly caused Mendoza's death—being pinned and restrained in a way that caused him to asphyxiate. However, their contentions are based on their one-sided version of the facts.

The same is true of the one decision they contend definitively shows that there was no clearly established constitutional right to be free from Macias's use of force at the time of this incident—*Mattos, supra,* 661 F.3d 433.

The *Mattos* court considered two consolidated appeals in section 1983 cases involving the use of Tasers. In the first, a woman named Brooks, who was seven months pregnant, was pulled over for driving 12 miles per hour over the speed limit. Brooks denied that she had been speeding and refused to sign the traffic citation. After several attempts to talk her out of the car failed, an officer displayed his Taser and warned her he might use it. Brooks told the officer she was pregnant and also said she needed to use the restroom. More officers arrived and when they tried to pull Brooks from her car, she resisted

---

[11] After respondents raised this issue in their brief, appellants did address this factual issue in their appellate reply brief. Apart from this, however, their reply brief continues their one-sided recitation of the facts.

by stiffening her body and grabbing the steering wheel. The officers then "Tasered" her three times in drive mode.

In the second, police were called to the Mattos home in response to a domestic dispute call. The officers eventually ended up inside the family home. One officer said the husband was under arrest, but the wife was standing in front of the husband at that point. When the officer moved in to arrest the husband, the wife put out her arm to stop the officer from pressing against her breasts. Without warning, the officer fired his Taser at the wife in dart mode.

The Ninth Circuit held that the police in each instance had used excessive force under the circumstances and violated the plaintiffs' constitutional rights. However, at the time of each incident (2004 for Brooks and 2006 for Mattos) only three federal circuit courts had published decisions concerning the use of Tasers, and each found no constitutional violation, the *Mattos* court said. The first, *Russo v. City of Cincinnati* (6th Cir. 1992) 953 F.2d 1036, involved the use of a Taser on a mentally ill man who was reportedly homicidal and who, upon the officers' arrival, threatened to kill anyone who entered his apartment, opened his door with a knife in each hand, and then rushed toward the officers. The second, *Hinton v. City of Elwood, Kansas* (10th Cir. 1993) 997 F.2d 774, involved a man stopped for questioning for the misdemeanor of disturbing the peace. The man was "Tasered" after he refused to talk, shoved an officer, struggled and flailed with officers, and then bit them. The third, *Draper v. Reynolds* (11th Cir. 2004) 369 F.3d 1270 involved a truckdriver who was pulled over because his license plate was not properly illuminated. The driver became agitated and confrontational, and when he refused to comply with several requests to produce certain documents, the officer "Tasered" him.

Because no circuit court cases had found a constitutional violation from Taser use, the *Mattos* court concluded that even though the force used on Mattos and Brooks was excessive, it could not conclude that every reasonable police officer would have understood beyond debate that "Tasering" those plaintiffs under the circumstances of each case constituted excessive force. (*Mattos, supra*, 661 F.3d at pp. 448, 452.)

Based on *Mattos*, appellants contend that even if we conclude there was sufficient evidence that Macias used excessive force, which they dispute, the unlawfulness of his conduct had not been clearly established at the time of Mendoza's death in March 2007. We disagree.

■ *Mattos* involved one plaintiff who actively resisted police officers, and another who appeared, albeit mistakenly, to be pushing against an officer

in the process of making an arrest. The three circuit court decisions the *Mattos* court cited to support its conclusion that the use of a Taser on those plaintiffs in those circumstances was not clearly unlawful all involved dangerous or confrontational suspects who were resisting arrest or other police commands. It is well established that the language of an opinion must be construed in light of the facts of the particular case, an opinion's authority is no broader than its factual setting, and the parties cannot rely on a rule announced in a factually dissimilar case. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1121 [66 Cal.Rptr.2d 337]; *U.S. v. Miscellaneous Jewelry* (D.Md. 1987) 667 F.Supp. 232, 246.) Based on the facts at issue in *Mattos* and the decisions upon which it relied, we conclude that it has no application beyond the use of a Taser to stun a suspect who is at least offering some apparent resistance to arrest or other police intervention.[12]

By contrast, numerous federal court decisions made it clear *before 2007* that using various types of force, including Tasers, on a compliant, nonresistant suspect violated clearly established constitutional rights. We begin with two pepper spray cases. First is *LaLonde v. County of Riverside* (9th Cir. 2000) 204 F.3d 947 (*LaLonde*) where the plaintiff, who had initially resisted a legitimate arrest, was pepper sprayed and then suffered a back injury when the officers handcuffed him. The plaintiff complained that the officers failed to help him rinse the pepper spray from his eyes after he was subdued, and that the force used to cuff him was excessive. In reversing a pretrial ruling that awarded judgment to the defendants on the ground of qualified immunity, the *LaLonde* court held that there was sufficient evidence for a jury to determine whether excessive force had been used.

As for whether such a constitutional violation would have been clearly established at that time, the court focused on the use of force against an arrestee who is under control and helpless. The court pointed to earlier decisions which held that no case law is required for a police officer to know that siccing a police dog on a handcuffed suspect who is fully under control constitutes excessive force. (*LaLonde, supra*, 204 F.3d at p. 961.) The court analogized that use of force to pepper spray, noting that when a suspect surrenders and is rendered helpless, "any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force." (*Ibid.*)

*LaLonde* was applied in *Headwaters Forest Defense v. County of Humboldt* (9th Cir. 2002) 276 F.3d 1125 (*Headwaters*). The plaintiffs were a group of

---

[12] Although we must follow applicable decisions of the United States Supreme Court, we are not bound by decisions of the lower federal courts. (*Tully v. World Savings & Loan Assn.* (1997) 56 Cal.App.4th 654, 663 [65 Cal.Rptr.2d 545].)

environmental protesters who were repeatedly pepper sprayed by the police. The defendants obtained summary judgment on the ground of qualified immunity, but the Ninth Circuit reversed. Viewing the facts most favorably to the plaintiffs, they were sitting peacefully, were easily moved by the police, and did not threaten to harm the officers. After holding that the use of force under those circumstances violated the plaintiffs' constitutional rights, the *Headwaters* court next concluded that the right was clearly established at the time of the protest because the plaintiffs had surrendered and were helpless. (*Id.* at p. 1130.)

This was so, the *Headwaters* court held, because even though no previous case had prohibited the precise force used against the protesters, *LaLonde* had made it clear that it was unnecessary to use pepper spray on protesters over whom the officers had control. (*Headwaters, supra*, 276 F.3d at p. 1130.)

The court in *Orem v. Rephann* (4th Cir. 2008) 523 F.3d 442, 448–449, used this rationale when holding that a police officer who "Tasered" an uncooperative arrestee while she was restrained by hobbles and inside a police car violated a constitutional right that was clearly established as of 2005. So too did the courts in *Michaels v. City of Vermillion* (N.D. Ohio 2008) 539 F.Supp.2d 975, 990, and *Batiste v. City of Beaumont* (E.D.Tex. 2006) 426 F.Supp.2d 395, 402, where a mentally ill woman who had been arrested and taken to a hospital where she was repeatedly "Tasered" by officers, produced evidence that she had been docile and compliant.

Several nonpublished district court decisions have reached the same conclusion. (*Sleeman v. Oakland County* (E.D.Mich., May 7, 2007, No. 06-10953) 2007 WL 1343403 [in 2005, the law clearly established that "Tasering" someone who was not resisting and posed no threat, especially if handcuffed, violates the 4th Amend.]; *Richards v. Janis* (E.D.Wn., Oct. 17, 2007, No. CV-06-3064-EFS) 2007 WL 3046252 [the law at the time of the conduct in 2005 clearly established that a Taser must not be used against someone who is handcuffed and not resisting]; *DeSalvo v. City of Collinsville, Illinois* (S.D.Ill., Oct. 7, 2005, No. 04-CV-0718-MJR) 2005 WL 2487829 [a reasonable police officer would have known that it would be unlawful to Taser a plaintiff who was not physically resisting or struggling in any way].)[13]

---

[13] Not only may we cite and rely on unpublished federal district court decisions as persuasive authority (*Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1432, fn. 6 [119 Cal.Rptr.3d 513]), we may consider such decisions when determining whether a constitutional right was clearly established for purposes of our qualified immunity analysis (*Drummond, supra*, 343 F.3d at p. 1060).

Finally, there is *Drummond, supra,* 343 F.3d 1052, which involves comparable physical force to what happened here—handcuffed suspect, on his stomach, officer applying pressure on suspect's back. The plaintiff in that section 1983 action was the guardian of a mentally ill man who ended up in an irreversible coma from compression asphyxia when police officers who wanted to hold him for transport to a mental health facility knocked him to the ground and kneeled on his back and neck. The Ninth Circuit partially reversed a summary judgment for the defendants on the qualified immunity issue, holding that such force was excessive, and, because the man was compliant and had complained about his breathing, violated a clear constitutional right. (343 F.3d at pp. 1061–1062.)

When the factual settings and principles of these decisions are tied together, they show that as of March 2007, Mendoza had a clearly established constitutional right to be free from being "Tasered," punched, and pinned so hard on his stomach that he asphyxiated from any point at which he was compliant and not resistant. As we have already observed, appellants have ignored all the evidence in the record that would support such a finding.

Even so, we must reconcile this evidence with the jury's finding that Mendoza was 30 percent at fault. We begin with the evidence that Mendoza continued to disobey Macias's repeated commands to sit down after Mendoza objected to having his blood drawn. Although Nurse Valenzuela testified that Mendoza was seated when he was first "Tasered," the jury might have disbelieved that evidence and found that Mendoza was offering resistance or posed some threat that justified Macias's initial use of the Taser.

However, the jury found that not only was Macias 70 percent at fault, it also found that he acted with malice, oppression or fraud to justify an award of punitive damages against him. Consistent with these findings is evidence concerning Macias's conduct in continuing to Taser and punch Mendoza after he fell to the floor. We begin with the 42-second videotape that appellants did not include in the appellate record, and did not discuss. According to Miranda, that video showed Macias hitting Mendoza while Deputy Velasquez restrained him. This must have occurred after the first "Tasering" incident, but before the three other police officers arrived to restrain Mendoza. Because appellants have the burden of providing a record that affirmatively demonstrates error, but did not include the videotape in the appellate record, we presume that the videotape contained evidence showing the use of excessive force. (*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 122–123 [40 Cal.Rptr.3d 48] [nonsuit for defendants in § 1983 excessive force case affirmed in part because plaintiff failed to include in the record

videotape showing the blood draw during which the allegedly improper conduct occurred]; *Crummer v. Zalk* (1967) 248 Cal.App.2d 794, 796–797 [57 Cal.Rptr. 185] [where record was inadequate to demonstrate error, court assumed there was evidence to support the trial court's findings].)

Even without that presumption, the testimony of Madrigal and Miranda provides sufficient evidence that excessive force was used after Mendoza fell to the floor. According to their testimony, Mendoza was not struggling with Macias, swinging the chair to which he was handcuffed, or otherwise resisting. Instead, Macias continued his use of force even though, as Miranda said, Mendoza was completely subdued, crying out in pain, and moving only as an involuntary response to being repeatedly punched and "Tasered." Although the evidence is in conflict, the Taser log shows that Macias used the weapon 14 times, in some instances for as long as 30 seconds. While restraint asphyxia was the direct cause of Mendoza's death, respondents' medical expert testified that the force applied right before then weakened Mendoza and made him more susceptible to the restraint force used later.

Appellants contend Macias cannot be liable for the restraint asphyxia itself because respondents' medical expert testified, based on his review of the records, that Macias was restraining Mendoza's left arm while the other officers were on top of Mendoza. However, there was eyewitness testimony from Miranda which supports a finding that Macias was on top of Mendoza's back while Mendoza was pinned and handcuffed.

Miranda testified that Macias was on top of Mendoza's right hip and was "over on top of his side" while he was alternately punching and "Tasering" Mendoza. He later testified that when the three other West Covina police officers arrived to assist Macias, they got on top of Mendoza "next to the officer on top of him." Under the substantial evidence standard of review, this testimony supports a finding that when Mendoza was moaning and barely moving, the three officers whom Macias called for backup joined Macias atop Mendoza. Alternatively, the jury could have found that even if Macias was only restraining Mendoza's left arm, his conduct facilitated the asphyxiation caused by other officers on Mendoza's back.

Similar to the decedent in *Drummond, supra*, 343 F.3d 1052, who complained about his breathing, Mendoza pleaded with the officers, "Stop. No more. That's it." According to respondents' use of force expert, it was Macias's job as the officer in charge to make sure that the other officers kept Mendoza's airway open.

(5) Taken as a whole, the combined effect of this evidence supports a finding that Macias punched and "Tasered" a nonresisting and compliant man that he knew was emotionally troubled and physically ill, and continued to do so when Mendoza did no more than flinch from the pain and cry for help. It also shows that Macias was responsible for the restraint that caused Mendoza to asphyxiate both as an active participant who was atop Mendoza and because he did not fulfill his duty to ensure that Mendoza was able to breathe while he was being pinned and handcuffed. As our lengthy discussion above makes clear, such conduct violated a clearly established constitutional right.

2. *The Damage Award Was Not Excessive and Was Supported by Substantial Evidence*

■ Under Code of Civil Procedure section 377.61, the trier of fact in a wrongful death action may award such damages as are just under all the circumstances of the case. Damages for wrongful death are measured by the financial benefits the heirs were receiving at the time of death, those reasonably to be expected in the future, and the monetary equivalent of loss of comfort, society, and protection. (*Corder v. Corder* (2007) 41 Cal.4th 644, 661 [61 Cal.Rptr.3d 660, 161 P.3d 172] (*Corder*).) Recovery for emotional distress—grief and sorrow—is not allowed. (*Id.* at p. 662.)

Appellants moved for a new trial on the ground that the damage award of $750,000 for each respondent was excessive and not supported by sufficient evidence. They contend the trial court erred when it denied their motion, based on the following: Mendoza left Mexico in 2005 without telling his family; he never returned for a visit, and his sons never came to visit him; his contact was limited to occasional phone calls; his sons did not attend his funeral in the United States; he was a day laborer and there was no evidence that he provided financial support to his family; he was an alcoholic with high blood pressure and diabetes; and there was no evidence of his life expectancy. Even though the sons testified to the love and affection they shared with Mendoza, appellants contend that a combined award of $1.5 million must have been based on sympathy and passion in an effort to compensate the sons for their emotional loss.

We review the jury's award under the substantial evidence standard and defer to the trial court's denial of a new trial motion based on excessive damages because of the trial judge's greater familiarity with the case. The amount awarded is peculiarly within the jury's discretion. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614–615 [103 Cal.Rptr.2d 492].) There is no fixed standard by which we can determine that an award is excessive. We usually defer to the jury's discretion unless the record shows inflammatory evidence, misleading instructions, or improper argument by counsel that

would suggest the jury relied on improper considerations. (*Ibid.*) We will interfere only when the award is so disproportionate to the injuries suffered that it shocks the conscience and virtually compels the conclusion the award was based on passion or prejudice. (*Ibid.*)

■ Cases allowing recovery for pecuniary value of loss of affection, society, and comfort "suggest a realization that if damages truly were limited to 'pecuniary' loss, recovery frequently would be barred by the heirs' inability to prove such loss. The services of children, elderly parents, or nonworking spouses often do not result in measurable net income to the family unit, yet unquestionably the death of such a person represents a substantial 'injury' to the family unit for which just compensation should be paid." (*Krouse v. Graham* (1977) 19 Cal.3d 59, 68 [137 Cal.Rptr. 863, 562 P.2d 1022].) "Recovery for loss of affection and society in a wrongful death action thus fulfills a deeply felt social belief that a tortfeasor who negligently kills someone should not escape liability completely, *no matter how unproductive his victim.*" (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 452 [138 Cal.Rptr. 302, 563 P.2d 858], italics added.) Factors relevant when assessing a claimed loss of society, comfort, and affection may include the closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving. (*Corder, supra*, 41 Cal.4th at p. 662.)

Appellants rely in part on *Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783 [6 Cal.Rptr.3d 650] to show that the quality of the Mendozas' relationship with their father did not justify the amounts awarded. This case is not like *Nelson*, where the decedent son had not visited his parents in 20 years, had maintained only infrequent correspondence, and had spent a large portion of that time in jail. By contrast, even though Mendoza left Mexico without immediately telling his sons, he called them frequently. Mendoza lived with his children their entire lives until he came to the United States in order to make a better life for himself and his family. Irvin Mendoza testified to the loving and caring relationship he had with his father, and how his father continued to support him emotionally during their frequent phone conversations. David Mendoza, Jr., offered similar testimony about the nature of his relationship with his father. Although neither child came to Mendoza's funeral in the United States, Mendoza was later buried in Mexico. One son attended that funeral, and the other did not because he could not bear to attend. Based on this record, and in light of the principles discussed above, we cannot conclude that the jury's award was excessive or the result of passion or sympathy.

### 3. *The Supposed Instructional Error Was Harmless*

A jury instruction that respondents requested and the trial court refused accidentally ended up in the stack of written instructions given to the jury. The instruction, which was not read aloud when the court charged the jury, said in essence that the West Covina Police Department's policy manual on Taser use was not evidence of an officer's reasonable use of force and was irrelevant to that issue. The jury had been deliberating for about one day when the error was discovered. The judge who presided over the trial was absent, and the judge sitting in for him called for directions. The trial judge told his substitute to call the jury back into the courtroom, explain the error, and tell them to disregard the instruction.

The substitute judge did so, and asked the jurors whether they could follow his admonition, and treat it as though they had never seen it. He asked for a show of hands for anyone who could not do so, and no hands were raised. He then asked anyone who could not follow his instructions to raise their hands, and again no hands were raised. The jury deliberated into the next day before reaching a verdict.

Appellants objected to this procedure, and then moved for a mistrial and a new trial on the ground of instructional error. They contend the trial court erred and that we should reverse for prejudicial error. As part of their argument, they point to the declaration of one juror submitted in connection with their new trial motion, who said that the disputed instruction was read aloud by another juror. However, the declaration does not state that this occurred after the jury was told to disregard it.

█ This issue merits little discussion. There is a well-established presumption that a jury will follow the trial court's admonishment to disregard improper matter. (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1123 [105 Cal.Rptr.3d 485].) This applies with equal force to erroneous instructions. (*People v. Douglas* (1990) 50 Cal.3d 468, 516 [268 Cal.Rptr. 126, 788 P.2d 640], overruled on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676] [where jury asked to see instructions and trial court provided copies with direction not to consider any portions that had been deleted, presumption that jury followed that direction applied].) We therefore hold that any instructional error was cured by the court's admonition, and therefore legally harmless.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their appellate costs.

Flier, J., and Grimes, J., concurred.