**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL MOSS; LESLEY ADAMS;
BETH WILCOX; RICHARD ROYER;
LEE FRANCES TORELLE; MISCHELLE
ELKOVICH; ANNA VINE, FKA Anna
Boyd, individually and on behalf of
a class of persons similarly situated;
JACKSON COUNTY PACIFIC GREEN
PARTY,

             *Plaintiffs-Appellees*,


        v.


UNITED STATES SECRET SERVICE, of
the Department of Homeland
Security; RALPH BASHAM, Former
Director of the United States Secret
Service, in his individual capacity;
TIM WOOD, United States Secret
Service Agent, in his official and
individual capacities; ROB SAVAGE,
United States Secret Service Agent,
in his official and individual
capacities; JOHN DOE, 1, United
States Secret Service Agent, in his
official and individual capacities,
participating in these actions and
known to the Defendant Secret

No. 10-36152

D.C. No.
1:06-cv-03045-
CL

Service, but unknown at this time to Plaintiffs; DAVID TOWE, Chief of Police of Jacksonville, Oregon, in his official and individual capacities; CITY OF JACKSONVILLE, a municipal corporation of the State of Oregon; MIKE WINTERS, Sheriff of Jackson County, in his official and individual capacities; JACKSON COUNTY, a municipal corporation of the State of Oregon; JOHN DOES, 2-20 that is, the commanding officers if other law enforcement agencies of public bodies participating in these actions, in their official and individual capacities, known to the identified Defendants, but unknown at this time to Plaintiffs; MUNCIPAL DOES, the public bodies employing defendants John Does 2-20; MARK SULLIVAN, Director of the United States Secret Service, in his official capacity,

*Defendants*,

and

RON RUECKER, Superintendent of the Oregon State Police, in his official and individual capacities; ERIC RODRIQUEZ, former Captain of the Southwest Regional

Headquarters of the Oregon State
Police, in his official and individual
capacities; TIM F. MCCLAIN,
Superintendent of the Oregon State
Police, in his official capacity;
RANDIE MARTZ, Captain of the
Southwest Regional Headquarters of
the Oregon State Police, in his
official capacity,

*Defendants-Appellants*.

MICHAEL MOSS; LESLEY ADAMS;
BETH WILCOX; RICHARD ROYER;
LEE FRANCES TORELLE; MISCHELLE
ELKOVICH; ANNA VINE, FKA Anna
Boyd, individually and on behalf of
a class of persons similarly situated;
JACKSON COUNTY PACIFIC GREEN
PARTY,

*Plaintiffs-Appellees*,

v.

UNITED STATES SECRET SERVICE, of
the Department of Homeland
Security; RALPH BASHAM, Former
Director of the United States Secret
Service, in his individual capacity;
JOHN DOE, 1, United States Secret
Service Agent, in his official and
individual capacities, participating in
these actions and known to the

No. 10-36172

D.C. No.
1:06-cv-03045-
CL

ORDER AND
AMENDED
OPINION

Defendant Secret Service, but unknown at this time to Plaintiffs; DAVID TOWE, Chief of Police of Jacksonville, Oregon, in his official and individual capacities; CITY OF JACKSONVILLE, a municipal corporation of the State of Oregon; MIKE WINTERS, Sheriff of Jackson County, in his official and individual capacities; JACKSON COUNTY, a municipal corporation of the State of Oregon; JOHN DOES, 2-20 that is, the commanding officers if other law enforcement agencies of public bodies participating in these actions, in their official and individual capacities, known to the identified Defendants, but unknown at this time to Plaintiffs; MUNICIPAL DOES, the public bodies employing defendants John Does 2-20; MARK SULLIVAN, Director of the United States Secret Service, in his official capacity; RON RUECKER, Superintendent of the Oregon State Police, in his official and individual capacities; ERIC RODRIQUEZ, former Captain of the Southwest Regional Headquarters of the Oregon State Police, in his official and individual capacities; TIM F. MCCLAIN, Superintendent of the Oregon State Police, in his official capacity;

RANDIE MARTZ, Captain of the
Southwest Regional Headquarters of
the Oregon State Police, in his
official capacity,

*Defendants*,

and

TIM WOOD, United States Secret
Service Agent, in his official and
individual capacities; ROB SAVAGE,
United States Secret Service Agent,
in his official and individual
capacities,

*Defendants-Appellants*.

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior District Judge, Presiding

Argued and Submitted
October 11, 2011—Portland, Oregon

Filed April 9, 2012
Amended February 26, 2013

Before: David M. Ebel[*], Marsha S. Berzon,
and N. Randy Smith, Circuit Judges.

Order;
Dissent to Order by Judge O'Scannlain;
Opinion by Judge Berzon

## SUMMARY[**]

### Civil Rights

The panel amended its prior opinion, reported at 675 F.3d 1213 (9th Cir. 2012), and denied the petition for rehearing and rehearing en banc in this action in which plaintiffs, demonstrators against President Bush during the 2004 Presidential campaign, asserted that Secret Service agents engaged in unconstitutional viewpoint discrimination in violation of the First Amendment by requiring them to demonstrate at a distance from the President because they were protesting – rather than supporting – his policies.

In the amended opinion, the panel responded to the dissent from the denial of the rehearing en banc, and stated that because this case arose on a motion to dismiss, any explanation for the agents' differential treatment of the pro- and anti-Bush demonstrators would have to be so obviously

---

[*] The Honorable David M. Ebel, Senior Circuit Judge for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

applicable as to render the assertion of unconstitutional viewpoint discrimination implausible. The panel stated that its opinion made clear that there was simply no apparent explanation for why the Secret Service agents permitted only the pro-Bush demonstrators and not the anti-Bush protestors, to remain along the President's after-dinner motorcade route, and the dissent suggested none.

Dissenting from the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Kozinski, Gould, Tallman, Bybee, Callahan, Bea and Ikuta, stated that the panel afforded unwarranted deference to legal conclusions in the protestors' complaint. Judge O'Scannlain further stated that the panel collapsed the two-pronged qualified immunity inquiry; defined the right at issue too broadly; and failed to give sufficient latitude to those charged with protecting the life of the President.

---

## COUNSEL

Cecil Reniche-Smith (argued), Office of the Oregon Attorney General, Salem, Oregon; Denise Gale Fjordbeck, Office of the Oregon Attorney General, Salem, Oregon, for Defendants-Appellants Ron Ruecker and Eric Rodriguez.

Edward Himmelfarb (argued), Jeremy Scott Brumbelow, Barbara L. Herwig, Mary Hampton Mason, Department of Justice, Washington, D.C.; Kelly A. Zusman, Office of the U.S. Attorney, Portland, Oregon, for Defendants-Appellants Rob Savage and Tim Wood.

Steven Wilker (argued), Paul W. Conable, Tonkon Torp, LLP, Portland, Oregon; Kevin Diaz, ACLU Foundation of Oregon, Inc., Portland, Oregon; Arthur B. Spitzer, American Civil Liberties Union of the National Capital Area, Washington D.C., for Plaintiffs-Appellees.

**ORDER**

The opinion filed on April 9, 2012, and appearing at 675 F.3d 1213, is amended as follows:

At slip opinion page 3846, 675 F.3d at 1229, immediately before the heading "C.    Fourth Amendment," add the following text:

<        *    *    *

As this case arises on a motion to dismiss, any explanation for the agents' differential treatment of the pro- and anti-Bush demonstrators would have to be so obviously applicable as to render the assertion of unconstitutional viewpoint discrimination implausible.  The Dissent from the Denial of Rehearing En Banc ("En Banc Dissent") maintains otherwise, so we briefly respond to its analysis:

Our opinion makes clear that there is simply *no* apparent explanation for why the Secret Service agents permitted only the pro-Bush demonstrators, and not the anti-Bush protestors, to remain along the President's

after-dinner motorcade route, *see* Op. at 1225, 1228; the En Banc Dissent suggests none. And the explanation proffered in the En Banc Dissent for the agents' actions in moving the anti-Bush demonstrators in the first place — namely that the pro-Bush demonstrators were not moved because they were ostensibly further than the protestors from the patio where President Bush was dining, *see* En Banc Dissent at 14 — is not a basis for granting the agents qualified immunity at the pleadings stage, for several reasons:

First, the En Banc Dissent's speculative explanation is non-responsive to the protestors' viewpoint discrimination claim. The question is not why the agents moved the anti-Bush protestors *somewhere*, but rather why the agents moved the protestors a considerable distance, to a location that, as we have explained, was in "relevant ways . . . not comparable" to the place where the pro-Bush group was allowed to remain. *See* Op. at 1228. No "tape[] measure" is required, *see* En Banc Dissent at 12, to appreciate that demonstrators separated by more than a full square block, and two roadways, from the public official to whom and about whom they wish to direct a political message will be comparatively disadvantaged in expressing their views. Nor does one need a noise dosimeter to know that the President will be able to hear the cheers of the group left alongside his travel route but unable to hear

the group restricted to an area about two square blocks away.

Perhaps there was a reason for the considerable disparity in the distance each group was allowed to stand from the Presidential party — for example, traffic, or an obstruction on the square block adjacent to the Inn, requiring that the anti-Bush demonstrators be moved more than a block further away. But, as matters now stand, nothing in the En Banc Dissent's entirely hypothetical "explanation is so convincing" as to render "*im*plausible" the plaintiffs' claim of viewpoint discrimination. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012). It is therefore premature at this stage to credit the En Banc Dissent's theory instead of the protestors'. *See id.* For the same reason, the En Banc Dissent's assertion, *see* En Banc Dissent at 12, that the panel has "second[] guess[ed]" the Secret Service agents' judgment about how best to protect the President fails to account for the fact that at this stage of the case, the record is devoid of *any* explanation for the substantial difference in where the two groups of demonstrators were allowed to stand relative to the President's locations.

Finally, the En Banc Dissent's invocation of the case law upholding certain buffer zones, *see id.* at 22, actually illustrates well why the complaint *does* establish a plausible

claim of a violation of clearly established law regarding impermissible viewpoint discrimination in a public forum.  Such buffers have been upheld *only*, and expressly, on the understanding that the restrictions are content and viewpoint neutral.  For example, in *Hill v. Colorado*, 530 U.S. 703 (2000), the Supreme Court upheld the buffer zone ordinance there at issue only after emphasizing that it applied "to all 'protest,' to all 'counseling,' and to all demonstrators whether or not the demonstration concerns abortion, and whether they oppose or support the woman who has made an abortion decision.  That is the level of neutrality that the Constitution demands." *Id.* at 725.  Had the ordinance in *Hill* established a one-hundred foot buffer zone for pro-abortion demonstrators and a three-hundred foot buffer zone for anti-abortion protestors, there is no doubt such a viewpoint discriminatory ordinance would have been summarily invalidated.

The protestors here plausibly allege just such a significant *difference* in the buffer zone in a public forum.  And *Hill* was, of course, decided before the events in this case.  The protestors therefore allege a plausible case of impermissible viewpoint discrimination as of the time this case arose.>

An amended opinion is filed concurrently with this order.

With this amendment, the panel has unanimously voted to deny appellants' petition for rehearing. Judge Berzon and Judge N.R. Smith have voted to deny the petition for rehearing en banc, and Judge Ebel so recommended.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The majority of the active judges have voted to deny rehearing the matter en banc. Fed. R. App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc are **DENIED**. Judge O'Scannlain's dissent from the denial of en banc rehearing is filed concurrently herewith.

**No further petitions shall be entertained.**

---

O'SCANNLAIN, Circuit Judge, joined by KOZINSKI, Chief Judge, and GOULD, TALLMAN, BYBEE, CALLAHAN, BEA, and IKUTA, Circuit Judges, dissenting from the denial of rehearing en banc:

To quote from the Government's brief, "[t]he panel's decision in this case is a textbook case-study of judicial second-guessing of the on-the-spot judgment that Secret Service agents assigned to protect the President have made about security needs." In effect, the panel holds today that the Constitution requires Secret Service agents to subsume their duty to protect the President to their newly created duty to act like concert ushers—ensuring with tape-measure accuracy that everyone who wants to demonstrate near the President has an equally good view of the show. This cannot

be the law.  With respect, I must therefore dissent from our unfortunate failure to rehear this case en banc.

# I

This is a *Bivens* action brought by Michael Moss and numerous others (the "protesters" or "anti-Bush demonstrators") against United States Secret Service agents Tim Wood and Rob Savage, who were assigned to protect President George W. Bush during a 2004 campaign appearance in Oregon.[1]  The protestors' second amended complaint alleges that the agents engaged in viewpoint discrimination in violation of their First Amendment rights when the agents moved them to create a security perimeter around the President.  To clarify the allegations pertinent to this claim, one must focus on the relevant facts as set forth in the protesters' operative complaint.

Anticipating the President's appearance at an event in Jacksonville, Oregon, both pro-Bush and anti-Bush demonstrators gathered approximately two blocks from the President's hotel there and conducted demonstrations with chants, slogans, and signs.  Spread out along California Street, the pro-Bush demonstrators were located just west of Third Street, and the anti-Bush demonstrators were located between Third and Fourth Streets.

While en route to the event, the President decided to eat dinner at the Jacksonville Inn, a restaurant on California Street between Third and Fourth Streets.  He arrived in his motorcade via Third Street, and both the pro-Bush and anti-

---

[1] The panel opinion resolves claims against other officers under 28 U.S.C. § 1983 which are not at issue here.

Bush demonstrators "had equal access" to him; the anti-Bush demonstrators were not moved from the President's motorcade route prior to his arrival at the Inn even though a Secret Service agent was already on site and could have ordered the police to do so.

Upon his arrival, the President entered the back patio of the Inn and was seated in the outdoor patio dining area. Shortly thereafter, the Secret Service directed local police to move "all persons between Third and Fourth streets"—immediately in front of the Inn—two blocks east to the east side of Fifth Street because "they did not want anyone within handgun or explosive range of the President." As it happened, these "persons" were the anti-Bush demonstrators. The pro-Bush demonstrators were not moved because they were already located one block west of the outdoor patio where the President was dining.

Alleging that the Secret Service agents' security rationale for moving them was "false" and that the agents were, in actuality, "tak[ing] action to stifle and suppress" their protest, the anti-Bush demonstrators brought this action, claiming that the Secret Service agents violated their First Amendment rights and seeking damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Their claim boils down to two grievances. First, after the security perimeter around the President was established, they were forced to demonstrate from an area approximately one block farther from the President than the pro-Bush demonstrators. And second, they were farther from the President's motorcade route than the pro-Bush demonstrators when he left the Inn because they were not returned to their original location before the President left.

The protestors' first amended complaint, alleging substantially similar facts, was dismissed for failure to plead a plausible claim. *See Moss v. U.S. Secret Serv.* (*Moss I*), 572 F.3d 962 (9th Cir. 2009). After the anti-Bush demonstrators filed their (now operative) second amended complaint, the Secret Service agents again moved to dismiss, arguing that the demonstrators still failed to plead a plausible claim or, alternatively, that they were entitled to qualified immunity. *Moss v. U.S. Secret Serv.* (*Moss II*), 675 F.3d 1213, 1221–22 (9th Cir. 2012). The district court denied their motion. *Id.* at 1219, 1222. The panel now affirms that denial, problematically holding that it is "clearly established" in a broad sense that "government officials may not disadvantage speakers based on their viewpoint" and denying the agents qualified immunity. *Id.* at 1228. It is in reaching this conclusion that the panel regrettably errs.

## II

The panel's qualified immunity analysis in this case is wrong—doubly wrong. First, the panel fails to separate the factual allegations that it must credit from the legal conclusions that it may not. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Second, the panel defines the right at issue at an impermissibly high level of generality, asking whether it is "clearly established" in a broad sense that "the government" may not engage in "viewpoint discrimination" and concluding that it is. *See Moss II*, 675 F.3d at 1228. Having started with the wrong assumptions and asked the wrong question, it is no surprise that the panel arrives at the wrong answer.

## A

Beginning with the assumption that it must "tak[e] the protestors' allegation of discriminatory motive [on the part of the Secret Service agents] as true," the panel quickly reaches the conclusion that it is "'beyond debate' that, particularly in a public forum, government officials may not disadvantage speakers based on their viewpoint." *Id.* By using the protestors' allegations about the agents' discriminatory motive as a starting point, however, the panel turns *Iqbal* on its head and places its analysis on shaky ground from the start.

### 1

As the panel notes, the protestors' complaint did indeed allege that the Secret Service agents engaged in viewpoint discrimination—reciting specifically that "[v]iewpoint discrimination by the Secret Service in connection with President Bush was the official policy of the White House." But, contrary to the panel's view, this allegation, which amounts to a legal conclusion about the agents' viewpoint-discriminatory motives, should not have been afforded a presumption of truth. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Here, the allegation of a discriminatory motive contained in the protestors' complaint is almost identical to the "legal conclusion" to which the Supreme Court refused to afford a presumption of truthfulness in *Iqbal*. *Id.* at 680–81 (rejecting the allegation that government officials "knew of, condoned, and wilfully and maliciously agreed to subject [Iqbal] to harsh conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and

for no legitimate penological interest" as a legal conclusion (internal quotation marks omitted) (second alteration in original)). Like in *Iqbal*, the bare allegation of a discriminatory motive contained in the protestors' complaint is "disentitle[d] to the presumption of truth." *Id.* at 681; *cf. Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). The panel should not have accorded it any weight in its qualified immunity analysis.

**2**

Setting aside such a bald assertion, only two factual allegations remain to support the protesters' claims about the Secret Service agents' discriminatory motives, neither of which is sufficient to establish plausibly that the agents harbored a subjective animus towards their viewpoint. The first—the protestors' description of purportedly similar Secret Service "actions against anti-government expressive activity"—does not tend to make plausible their claim that the named Secret Service agents sued *in this case* acted with the subjective purpose to suppress their message; none involve these same agents or the same circumstances, and the allegations do not show a pattern pervasive enough to establish an unspoken policy of discrimination, especially in light of the explicit Secret Service policy prohibiting such conduct. *Cf. Iqbal*, 556 U.S. at 682–83; *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").

The second—an out-of-context statement taken from the Presidential Advance Team Manual—both lacks the nefarious meaning that the anti-Bush demonstrators, and the panel, would ascribe to it, and is irrelevant. For one, when viewed in context, the statement appears in a section of the manual entitled "Crowd Raising and Ticket Distribution" and clearly refers to ticketed presidential events, from which demonstrators can be excluded without violating the First Amendment. *See Weise v. Casper*, 593 F.3d 1163, 1168 (10th Cir. 2010). But more importantly, the protestors never allege that the Secret Service agents were bound to follow this instruction, which is found in the Advance Team Manual—a guide written for the Presidential Advance Team and *not* the Secret Service. Indeed, the demonstrators have admitted that written Secret Service guidelines, which *do* apply to Secret Service agents, expressly "prohibit Secret Service agents from discriminating between anti-government and pro-government demonstrators."[2] The manual, therefore, not only lacks a nefarious meaning but also fails to have any bearing whatsoever on the motives of the Secret Service agents at issue in this case.

---

[2] An "advance man" is "[o]ne who arranges for publicity, protocol, transportation, speaking schedules, conferences with local government officials, and minute details of a visit, smoothing the way for a political figure." William Safire, Safire's Political Dictionary 8 (5th ed. 2008). By contrast, the Secret Service agents work for the Department of Homeland Security under the direction of the Secretary of Homeland Security, and are tasked with protecting the President. *See* 18 U.S.C. § 3056, *amended by* Pub. L. No. 112-257, 126 Stat. 2413 (2013). Given the very different roles of the advance team and the Secret Service—the former to "smooth[] the way" for a candidate and the latter to ensure his security—it is no wonder that their manuals contain different guidelines regarding demonstrators.

Given the lack of factual allegations to support the anti-Bush demonstrators' claim of subjective viewpoint animus, the panel should not have afforded this animus allegation a presumption of truth. The panel's subsequent failure to define properly the right at issue for purposes of qualified immunity further compounds this misstep.

## B

Taking into account the absence of allegations plausibly demonstrating subjective viewpoint animus, the panel's opinion should have proceeded to determine separately whether the facts as pleaded showed (1) a constitutional violation and (2) a violation of clearly established law. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Estate of Ford*, 301 F.3d at 1049 ("*Saucier*'s key point is that the qualified immunity inquiry is separate from the constitutional inquiry."). Instead, the panel erroneously collapses these two inquiries into one. Concluding that the objective factual events alleged in the complaint established a plausible claim of viewpoint discrimination, it eviscerates the clearly established prong—of course, the panel concludes, it is clearly established that officials may not engage in viewpoint discrimination. *See Moss II*, 675 F.3d at 1223–28.

## 1

Contrast the panel's approach with the leading qualified immunity cases. One easily could say, for example, in a Fourth Amendment case in which the facts alleged showed that officers used excessive force, that the use of excessive force violates clearly established Fourth Amendment principles. Or in an Eighth Amendment case in which the

facts alleged showed deliberate indifference, one could say
that deliberate indifference violates clearly established Eighth
Amendment principles.  But both those statements would be
fatally insufficient.  *See Saucier*, 533 U.S. at 201–03; *Estate
of Ford*, 301 F.3d at 1050–51.  It is equally fatal merely to
say that if the protestors have alleged sufficient facts to make
a plausible claim of viewpoint discrimination, they have also
shown a violation of clearly established law, because
viewpoint discrimination is clearly prohibited.  *See Weise*,
593 F.3d at 1167 (citing *Anderson v. Creighton*, 483 U.S.
635, 639–41 (1987)).  Put another way, "when it comes to
qualified immunity, merely stating that the government
cannot engage in viewpoint discrimination is just about as
general as stating that the government cannot engage in
unreasonable searches and seizures—an approach that is too
general for the qualified immunity analysis where a plaintiff
has the burden of demonstrating not only a constitutional
violation, but also a violation of clearly established law."
*Weise*, 593 F.3d at 1168 n.1 (citing *Anderson*, 483 U.S. at
639–41).

    To avoid this analytical pitfall, the Supreme Court has
mandated that, in qualified immunity cases, the contours of
the right must be clearly established in "a more
particularized, and hence more relevant, sense," meaning that
it must be "clear to a reasonable officer that his conduct was
unlawful in the situation he confronted." *Saucier*, 533 U.S.
at 202.  Contrary to this Supreme Court precedent, the panel
in this case simply fails to perform that analysis.  It fails to
consider whether, in a more particularized sense, the alleged
conduct of the Secret Service agents violated clearly
established law.  *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074,
2084 (2011).  In so doing, it commits an error all too common
to this circuit—one we have been specifically warned not to

commit again. *See id.*; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam); *Saucier*, 533 U.S. at 200.

It is clear that had the panel properly applied *Iqbal* and *al-Kidd*, it would have upheld qualified immunity. Absent the assumption that the Secret Service agents were purposefully engaging in viewpoint discrimination—which the panel should not have made in conducting the clearly established inquiry—the agents' actions did not violate "clearly established" law. *See Estate of Ford*, 301 F.3d at 1050 ("We do not assume that [the officers] acted with deliberate indifference, as that would assume the answer.").

**2**

Once properly framed in light of the factual allegations in the complaint, two questions of clearly established law are raised in this case: First, was it clearly established that moving one group to a location one block farther from the President than another when creating a Presidential security perimeter constituted a violation of that group's First Amendment rights? And second, was it clearly established that Secret Service agents, who moved a group to maintain a consistent security perimeter around the President, had to move the group back to their original location before the President could leave in his motorcade (or at least had to alter the motorcade route so that all involved got an equal chance to see the President)? The answer to these qualified immunity questions—the questions that the panel should have asked—is a clear "no."

**a**

In response to the first question, it should be noted that before this decision neither our precedent nor Supreme Court case law prevented Secret Service agents from establishing a security perimeter around the President.  Indeed, prior Supreme Court precedent had upheld analogous buffer zones to protect vulnerable patients attempting to enter healthcare facilities and to prevent targeted protests of an abortion doctor's home.  *See, e.g.*, *Colorado v. Hill*, 530 U.S. 703, 719–30 (2000); *Frisby v. Shultz*, 487 U.S. 474, 479–88 (1988).  Certainly, one would think, securing the safety of the President ranked as an interest at least on par with preventing harassment of patients and doctors.  *Cf. Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (noting that proper application of the qualified immunity standard is "nowhere more important than when the specter of Presidential assassination is raised").  Yet in denying the Secret Service agents qualified immunity in this case, our court holds today that it *is* not—and, even more egregiously, it was *clearly established* law that it *was* not, at least as early as 2004.

Moreover, before this decision, no law appeared to require Secret Service agents to ensure that groups of differing viewpoints were positioned in locations exactly equidistant from the President at all times.  But again, in this case, our court invents such a requirement and determines that it was long since "clearly established" in our First Amendment jurisprudence.  As the Government correctly points out, such a rule will be troublesome in application.  As of today, shall Secret Service agents carry tape measures when they engage in crowd control to ensure that groups with different viewpoints are at comparable locations at all times?

If they don't, they will now risk being subject to First Amendment lawsuits in nine Western states.

**b**

Turning to the second question—whether it was clearly established law that Secret Service agents had to return a group of demonstrators to their original location before the President could leave in his motorcade—one is again at a loss to identify any First Amendment principle that clearly demands such an action. *Cf. United States v. Grace*, 461 U.S. 171, 177–78 (1983) ("We have regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." (internal quotation marks omitted)); *Menotti v. City of Seattle*, 409 F.3d 1113, 1139 n.49 (9th Cir. 2005) ("[W]e hold that there is no constitutional requirement that protestors be allowed to reach their designated audience in the precise manner of their choosing . . . ."). Indeed, the assertion that some First Amendment doctrine would so require seems absurd. But the panel's holding today bizarrely assures us that this, too, is a "clearly established" ground for bringing a suit alleging infringement of one's First Amendment freedoms. It is hard to imagine how, in light of today's decision, Secret Service agents will navigate the treacherous path between the Scylla of our court's holdings in this case and the Charybdis of their duty to protect the President.

**c**

One final note: The operative complaint's lack of plausible allegations showing that the Secret Service agents in this case explicitly acted with a subjective intent to suppress the protestors' message differentiates this case from the one on which the panel relies in their qualified immunity analysis. *See Mahoney v. Babbitt*, 105 F.3d 1452, 1458–59 (D.C. Cir. 1997) ("The government has conceded that if appellants were carrying no signs or, indeed, if they were carrying signs favorable to the administration whose second Inaugural was being celebrated, their 'physical intrusion' would be welcomed. It is only the 'purpose of injecting [their] own convictions or beliefs' that causes the government to exclude them."). In light of the allegations in *Mahoney*, which expressly showed a subjective discriminatory purpose on the part of the National Park Service in denying a permit to a group of demonstrators, it is no wonder that the courts were able to find qualified immunity inapplicable and to conclude that the officials there violated clearly established law prohibiting viewpoint discrimination. *See id.* But in this case, where the anti-Bush demonstrators admit that the Secret Service agents offered a neutral security rationale for their actions, the panel should have assessed their objective conduct as alleged in the complaint to determine whether it plausibly demonstrated a violation of clearly established law. *See Estate of Ford*, 301 F.3d at 1050. Sadly, it did not do so; instead, it misstates the law and, ultimately, reaches the wrong result.

"[I]n light of the specific context of this case" the Secret Service agents did not violate any "clearly established" law. *See Saucier*, 533 U.S. at 201. As such, they were entitled to

qualified immunity, and the panel erred in denying it to them. *Id.*

## III

Our court's track record in deciding qualified immunity cases is far from exemplary, and with this decision, I am concerned that our storied losing streak will continue.[3] Although we may not have been able to rectify our past mistakes by rehearing this case en banc, we certainly *should have* used this opportunity to avoid repeating them. Alas, the panel here once again commits many familiar qualified immunity errors. It affords unwarranted deference to legal conclusions in the protestors' complaint. It collapses the two-pronged qualified immunity inquiry. It defines the right at issue too broadly. And it fails to give sufficient latitude to those charged with protecting the life of the President. This decision renders the protections of qualified immunity toothless. But even more devastating, this decision hamstrings Secret Service agents, who must now choose between ensuring the safety of the President and subjecting themselves to First Amendment liability.

I respectfully dissent from our failure to rehear this case en banc.

---

[3] *See, e.g.*, *al-Kidd*, 131 S. Ct. at 2084 (reversing the Ninth Circuit) (warning "the Ninth Circuit in particular" to avoid "defin[ing] clearly established law at a high level of generality"); *Brosseau*, 543 U.S. at 199 (same); *Saucier*, 533 U.S. at 200 (same); *Hunter*, 502 U.S. at 227–29 (same).

**OPINION**

BERZON, Circuit Judge:

During the 2004 presidential campaign, Plaintiff-Appellees, Michael Moss and others who opposed President Bush ("protestors" or "anti-Bush protestors"), organized a demonstration at a campaign stop in Jacksonville, Oregon. They contend that Secret Service agents, Defendant-Appellants Tim Wood and Rob Savage ("agents" or "Secret Service agents"), engaged in unconstitutional viewpoint discrimination in violation of the First Amendment, by requiring the protestors to demonstrate at a distance from the President because they were protesting – rather than supporting – his policies. In addition, the protestors maintain that the police officers who carried out the Secret Service agents' directions, supervised by Defendant-Appellants Ron Ruecker, Superintendent of the Oregon State Police, and Eric Rodriguez, Captain of the Southwest Regional Headquarters of the Oregon State Police ("police supervisors"), used excessive force in violation of the Fourth Amendment. They seek to hold Ruecker and Rodriguez liable for the use of this force.

We hold that the protestors have stated a claim against the Secret Service agents for violation of the First Amendment. The protestors have not, however, pleaded sufficient facts to sustain their Fourth Amendment claim against the police supervisors. We therefore hold that the excessive force claim should be dismissed.

## I. Factual and Procedural Background

### A.  Facts

During the 2004 presidential campaign, President George W. Bush was scheduled to spend the evening of October 14, 2004 in Jacksonville, Oregon at the Jacksonville Inn Honeymoon Cottage.[1]  A group of people opposed to President Bush organized a demonstration to protest his policies.  They discussed their plans with the Chief of the Jacksonville Police and with the Jackson County Sheriff, informing both law enforcement officials that the planned demonstration was to be multigenerational, peaceful, and law-abiding.  The Jackson County Sheriff agreed to the proposed protest route and stated that officers in riot gear would not be deployed unless necessary.  The Jacksonville Police Chief similarly stated that he did not plan to use riot-gear-clad police.

At about 5:00 p.m. on October 14, 2004, between two and three hundred anti-Bush protestors gathered in Griffin Park in Jacksonville.  An hour later, the protestors, in accordance with the demonstration route they had pre-cleared with local law enforcement, left the park and proceeded to California Street between Third and Fourth Streets.  They stood in front of the main building of the Jacksonville Inn, approximately two blocks south of the Inn's Honeymoon Cottage where the

---

[1] Because this is an appeal from an order denying Defendants' motion to dismiss, the facts described are taken from Plaintiffs' complaint and are assumed to be true.

President planned to stay.**²**  A similarly-sized group of pro-Bush demonstrators gathered across Third Street from the anti-Bush protestors.

After the two groups had gathered, the President decided to stop for dinner at the restaurant at the Jacksonville Inn, located in the main building.  Neither group was aware that the President would not proceed directly to the Honeymoon Cottage until approximately 7:00 p.m., an hour after the demonstrations in front of the Inn began.  After learning the President would be stopping at the restaurant, both pro- and anti-Bush demonstrators clustered on the side of the street on which the Inn's main building is located.  The anti-Bush demonstrators allege that at that point, "[b]oth sets of demonstrators had equal access to the President during his arrival at the Jacksonville Inn."

Shortly before the President was to arrive at the restaurant, the Secret Service agents on the scene requested that state and local police officers clear the alley from Third Street to the patio dining area behind the Inn, as well as the California Street alley running alongside the Inn.  Police officers, dressed in riot gear, cleared these alleys.  They also blocked Third Street, north of California Street, and began preventing demonstrators (both pro- and anti-Bush) from crossing the street at the intersection of Third and California Streets.

President Bush arrived at the Jacksonville Inn at approximately 7:15 p.m. and ate dinner on the Inn's outdoor patio, which was enclosed by a 6-foot-high wooden fence.

---

**²** A map of the area of Jacksonville in which the relevant events occurred is attached as an appendix to this opinion.

This fence, along with the buildings along California Street, made it impossible for the anti-Bush protestors to see the President. In addition, these obstacles, as well as police officers stationed around the perimeter of the Inn, prevented anyone from walking from the demonstration site to the President's location on the patio.

There were several other diners on the patio in addition to the President's party. In addition, upstairs from the restaurant was a group of approximately thirty people at a medical conference, some of whom ventured downstairs and, finding an unguarded door to the patio, were able to observe the President from a distance of approximately fifteen feet.

At about 7:30 p.m., the Secret Service agents directed state and local police to clear California Street between Third and Fourth Streets, where the anti-Bush protestors had been standing. They first directed the police to move the protestors to the east side of Fourth Street. Subsequently, the agents asked that the protestors be moved to the east side of Fifth Street. The agents assert that they told the police that the reason for these requests was to prevent anyone from being within handgun or explosive range of the President. The protestors allege that any security rationale provided by the agents to the police was false. Neither the pro-Bush demonstrators nor anyone staying at or visiting the Inn was required to move or to undergo security screening. The protestors maintain that, in fact, the real motive for the agents' action was the suppression of the protestors' anti-Bush viewpoint – that is, that the agents sought to prevent the President or the media from seeing or hearing the protestors' message.

In accordance with the Secret Service directive, police officers in riot gear formed a line across California Street, facing the anti-Bush demonstrators and with their backs to the pro-Bush demonstrators.   The officers made amplified announcements, unintelligible to many of the protestors, stating that the protestors' assembly was now unlawful, and ordering them to move.  The protestors allege that the police failed to ascertain whether the protestors had heard and understood the direction to move, let alone give them time to move of their own accord. Instead, officers forcibly moved the protestors, in some cases violently shoving them, striking them with clubs, and firing pepper spray bullets.

Once the anti-Bush protestors had been moved to the east side of Fifth Street, the police officers divided them into two groups and encircled the groups, preventing some protestors from leaving the area and separating some families. The defendant police supervisors Ruecker and Rodriguez were not present at the protest, but the protestors allege that the two supervisors nevertheless supervised and directed the police action and that they were responsible for the training, or lack thereof, that led to the force used against the protestors.

### B. Procedural History

At issue in this appeal is the protestors' second amended complaint ("SAC").  Their first amended complaint ("FAC") contained several claims for relief arising out of the facts detailed above.  Only two of these claims remain at issue here: (1) a claim for damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), against Secret Service Agents Wood and Savage in their individual capacities for viewpoint discrimination in violation of the First Amendment; and (2) a claim for damages under 42 U.S.C.

§ 1983 against police supervisors Ruecker and Rodriguez in their personal capacities for excessive force in violation of the Fourth Amendment.

After the protestors filed the FAC, the Secret Service agents moved to dismiss. The district court denied their motion and also denied them qualified immunity. The agents appealed to this court. *See Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009) ("*Moss I*"). We held that although the facts the protestors pleaded in the FAC did "not rule out the possibility of viewpoint discrimination," they were insufficient to allege such a claim with the degree of precision required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), both of which had been decided after the protestors filed the FAC. *Id.* at 971–72.

In particular, we held in *Moss I* that the protestors' unsupported allegations of "impermissible motive on the Agents' part," a "*sub rosa* Secret Service policy of suppressing speech critical of the President," and "systematic viewpoint discrimination at the highest levels of the Secret Service" were, under the post-*Iqbal* pleading standards, "conclusory and . . . therefore not entitled to an assumption of truth." *Moss I*, 572 F.3d at 970. We further determined that the protestors' allegation that the agents directed the police to move the protestors to the east side of Fourth Street was insufficient to support a claim of viewpoint discrimination. We explained that the Fourth Street location was "comparable" to the location of the pro-Bush demonstrators in terms of its proximity to the President when he was dining at the Inn's restaurant. *Id.* at 971. Finally, *Moss I* held that the protestors' allegations concerning the guests and diners at the Inn who were within close range of the President but not

subject to screening or required to move "offer[ed] little if any support for" the protestors' viewpoint discrimination claim, because these guests and diners were not seeking to communicate their views and therefore were not similarly situated to the protestors. *Id.* For these reasons, we concluded that the protestors had "fail[ed] to plead facts plausibly suggesting a colorable *Bivens* claim against the Agents." *Id.* Recognizing, however, that the FAC had been filed before the Supreme Court decided *Twombly* and *Iqbal*, and that it was possible the complaint could be amended to meet the standards articulated in those cases, we granted the protestors leave to amend. *Id.* at 972.

Accordingly, the protestors amended their complaint. The SAC, the complaint at issue here, raises the same claims as the FAC but supports these claims with more – and more detailed – factual allegations.

After the protestors filed the SAC, the Secret Service agents again sought to dismiss the First Amendment claim. Reviewing the agents' motion to dismiss, the magistrate judge to whom the case was referred concluded that the allegations in the FAC, held by *Moss I* to be conclusory, were in the SAC "supported by factual allegations and . . . thus entitled to an assumption of truth" and that "[v]iewing all the factual allegations entitled to assumption of truth in the SAC," the protestors had "pled a plausible claim." The state police supervisors also filed a motion to dismiss. The magistrate recommended that this motion also be denied, explaining that under the framework set forth by this court in *al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009), *overruled on other grounds by Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), the protestors had pled a plausible § 1983 Fourth Amendment claim against the supervisors. The magistrate

determined that neither the Secret Service agents on the First Amendment claim nor the police supervisors on the Fourth Amendment claim are entitled to qualified immunity at this stage.

The district court adopted the magistrate's report and recommendation in full. Before us now are the Secret Service agents' and police supervisors' appeals of the district court's denial of qualified immunity.

We begin by briefly discussing the framework for evaluating whether qualified immunity is appropriate, as that framework is pertinent to both of the claims at issue. We then address the First Amendment and Fourth Amendment claims in turn.

## II. Discussion

### A. Qualified Immunity Framework

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of such immunity is to ensure that public officials may be held "accountable when they exercise power irresponsibly," while "shield[ing]" them "from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

To determine whether a government official is entitled to qualified immunity, we conduct a two-prong analysis. *See,*

*e.g.*, *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011). Government officials are denied qualified immunity only if (1) "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right"; and (2) "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal quotation marks omitted); *see Mattos*, 661 F.3d at 440. These prongs need not be addressed in order; rather courts may "exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The first prong assesses whether the wrong a plaintiff alleges is, in fact, a constitutional violation. The second prong assesses the objective reasonableness of the official's conduct in light of the decisional law at the time: A right is clearly established for purposes of qualified immunity only where the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dunn v. Castro*, 621 F.3d 1196, 1200 (9th Cir. 2010) (internal quotation marks omitted). "Because qualified immunity is an immunity from suit rather than a mere defense to liability, courts have also evaluated the sufficiency of the allegations of the defendant's personal involvement in the deprivation of the right at the second stage of the qualified immunity analysis." *al-Kidd v. Ashcroft*, 580 F.3d at 964 (internal citation, quotation marks, and emphasis omitted); *see Iqbal*, 129 S. Ct. at 1946.

In analyzing the protestors' First Amendment claim against the Secret Service agents, we begin by addressing the first prong of the qualified immunity framework – whether the facts the protestors have alleged make out a constitutional

violation – and then move to the next prong – whether the right the protestors allege was violated was clearly established at the time of the protest. We proceed in this order because, in this instance, one cannot sensibly determine the reasonableness of the agents' actions without carefully identifying the right they are alleged to have violated and the conduct by which they are alleged to have done so.

With respect to the excessive force claim, we ultimately hold that the protestors have alleged insufficient facts to state a claim against the defendant police supervisors in particular. We nevertheless conduct both prongs of the qualified immunity analysis to clarify which parts of the SAC are sufficient and in what respects it must be amended to state a claim.

## B. First Amendment

### 1.

The anti-Bush protestors claim that the Secret Service agents sought to suppress political speech undertaken on a public street based on the viewpoint of that speech. This claim strikes at the core of the First Amendment.

Public streets are "the archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988), as they have "immemorially been held in trust for the use of the public," *id.* at 481 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). In such "traditional public fora, the government's ability to permissibly restrict expressive conduct is very limited. . . . First Amendment protections are strongest, and regulation is most suspect." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009)

(internal quotation marks and citations omitted). Moreover, "[p]olitical speech is core First Amendment speech, critical to the functioning of our democratic system." *Id.* at 1021. "Traditional public fora," such as the public streets upon which the anti-Bush protestors sought to demonstrate "gain even more importance when they are host to core First Amendment speech." *Id.* at 1022.

As the Supreme Court has repeatedly reiterated, government regulation of political speech in a public forum based on its content is presumptively unconstitutional. *See United States v. Playboy Entm't Group*, 529 U.S. 803, 817 (2000); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. "Viewpoint discrimination is thus an egregious form of content discrimination," one from which "[t]he government must abstain." *Id.* The government may not regulate speech based on "the specific motivating ideology or the opinion or perspective of the speaker," *id.*; nor may it "favor some viewpoints or ideas at the expense of others," *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). We recently summarized these longstanding principles as instructing that "government may not favor speakers on one side of a public debate." *Hoye v. City of Oakland*, 653 F.3d 835, 849 (9th. Cir. 2011).[3]

---

[3] *Hoye* was, of course, decided after the incident giving rise to this case. We cite it only for its succinct précis of many years of precedents on viewpoint discrimination.

A restriction on speech is viewpoint-based if (1) on its face, it distinguishes between types of speech or speakers based on the viewpoint expressed; or (2) though neutral on its face, the regulation is motivated by the desire to suppress a particular viewpoint. *See Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc) (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994)); *ACLU v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The anti-Bush protestors allege both that the agents' actions were facially viewpoint discriminatory – that is, that the agents explicitly treated pro- and anti-Bush demonstrators differently – and that their actions, even if facially neutral, were motivated by an impermissible purpose to discriminate against the anti-Bush viewpoint the protestors expressed.

### *a.*

In the FAC, the anti-Bush protestors alleged that the Secret Service directed police to move them to the east side of Fourth Street, approximately the same distance from where the President was dining as the pro-Bush demonstrators. *Moss I*, 572 F.3d at 971. *Moss I* held this allegation insufficient to support a plausible claim of viewpoint discrimination, explaining:

> If the Agents' motive in moving Plaintiffs away from the Inn was . . . suppression of Plaintiffs' anti-Bush message, then presumably, they would have ensured that demonstrators were moved to an area where the President could not hear their demonstration, or at least to an area farther from the Inn then [sic] the position that the

pro-Bush demonstrators occupied. Instead,
according to the complaint, the Agents simply
instructed state and local police to move the
anti-Bush protestors to a location situated a
comparable distance from the Inn as the other
demonstrators, thereby establishing a
consistent perimeter around the President.

*Id.*

Now, in the SAC, the protestors allege that the agents did
indeed direct that the anti-Bush demonstration be moved
farther from the Inn than the pro-Bush demonstration. The
SAC avers that the Secret Service agents not only directed the
police to move the anti-Bush protestors "to the east side of
Fourth Street," but that the agents "subsequently" directed
that the protestors be moved "to the east side of Fifth Street."
The pro-Bush demonstrators were left in place on the west
side of Third Street. As a result, the anti-Bush protestors
were more than a block farther from where the President was
dining than the pro-Bush demonstrators, and, one can infer,
were therefore less able to communicate effectively with the
President, media, or anyone else inside or near the Inn.

The agents object to the protestors' failure to plead
specifically that the President could no longer hear their
protests once they were moved. While such an allegation
would strengthen the protestors' complaint, its absence does
not make their claim implausible. Regardless of whether the
President and those near him could actually hear the
protestors after they had been moved, it is a plausible
inference from the facts alleged that the protestors' chants
would be less intelligible from two blocks away.

In addition, and critically, if allowed to remain in their initial locations, members of both the pro- and anti-Bush groups would have been standing along the motorcade route by which the President left the restaurant. However, once the Secret Service agents moved them, the anti-Bush protestors were two blocks away from the motorcade route, while the pro-Bush demonstrators remained along it, and, according to the SAC, could "cheer for President Bush as he traveled to the Honeymoon Cottage."

In their brief, the agents insist that the President's motorcade route between the restaurant and the Honeymoon Cottage is "irrelevant," because the "armored limousine" in which the President was traveling had far greater security than the open-air patio where the President dined. This argument is unavailing for two reasons: First, it rests on facts outside of the complaint and is therefore not properly cognizable at this stage. Second, the assertion of a viewpoint-neutral rationale cannot transform a facially discriminatory policy – allowing one group of demonstrators access to the President while moving protestors with the opposing view further away – into a valid one. *See ACLU*, 466 F.3d at 793.

In sum, the anti-Bush protestors have alleged that, at the direction of the Secret Service agents, they were moved to a location where they had less opportunity than the pro-Bush demonstrators to communicate their message to the President and those around him, both while the President was dining at the Inn and while he was en route to the Honeymoon Cottage. These allegations support a plausible claim of viewpoint discrimination.

### *b.*

In addition to these allegations of facial viewpoint discrimination, the anti-Bush protestors also allege in the SAC that the Secret Service agents acted with an impermissible motive of shielding the President from those expressing disapproval of him or his policies.  As the Supreme Court has explained,

> [t]he principal inquiry in determining content [or viewpoint] neutrality . . . is whether the government has adopted a regulation of speech *because of* disagreement with the message it conveys. . . . The government's purpose is the controlling consideration.

*Ward*, 491 U.S. at 791 (emphasis added) (internal citations omitted).  Thus, if true, the motive allegation would be sufficient in and of itself to support a claim of viewpoint discrimination in violation of the First Amendment.  That is, it would be adequate to establish a First Amendment violation even if there had been no pro-Bush demonstrators and therefore no differential treatment.

As noted, the Secret Service agents ostensibly told the police on the scene that their reason for moving the anti-Bush protestors was to ensure that nobody was within handgun or explosive range of the President.  The protestors allege that even if the agents did give the police such an explanation, it was merely a pretext and that the agents were in actuality motivated by the determination to suppress the protestors' anti-Bush message. "[A] restriction on expressive activity is" only content- or viewpoint-neutral if it is "based on a non-pretextual reason divorced from the content of the

message attempted to be conveyed." *United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000). At this stage, the protestors need only plead facts that make plausible their claim that they were moved because of their viewpoint – that the security rationale, if indeed offered by the agents at all, was pretextual. The protestors, in the SAC, have met this burden.

First, the SAC states that it would have been impossible from where the protestors were initially located – and certainly from the east side of Fourth Street, where the Secret Service agents initially directed they be moved – for anyone to reach the President with a handgun or an explosive. The police cleared the alley between where the protestors were demonstrating and the Inn where the President dined, and officers, clad in riot gear, blocked any access to that alley. In addition, there were buildings and a six-foot high fence blocking any contact between the anti-Bush protestors and the President. None of the protestors attempted to surmount these obstacles to get access to the President. The protestors therefore assert they posed no threat to the President, and there was thus no reason for them to be moved from their initial location, and certainly no reason for them to be pushed beyond the east side of Fourth Street to the east side of Fifth Street. Moreover, according to the SAC, the obstacles between the anti-Bush protestors and the President were similar to those faced by the pro-Bush demonstrators. If the location of the anti-Bush protestors had been a significant security risk, they reason, so too would have been that of the pro-Bush demonstrators.

Second, the Secret Service agents allowed the pro-Bush demonstrators to gather along the motorcade route, well within handgun or explosive "range of the President as he

traveled from the Inn to the Honeymoon Cottage where he was staying," As noted, the Secret Service agents argue that this distinction does not indicate that their security rationale was pretextual, because the "armored limousine" in which the President traveled "provide[d] a substantially higher degree of protection from potential external threats" than did the open-air patio where he ate dinner. But one could view this explanation as further evidence of an impermissible motive: Even where there admittedly was no security threat, the anti-Bush demonstrators were forcibly located farther away from the President than the pro-Bush demonstrators, such that the pro-Bush demonstrators were within sight and hearing range of the President while the anti-Bush protestors were two blocks away.

Finally, the SAC elaborates in much more detail a conclusory allegation in the FAC that the Secret Service maintains "an officially authorized pattern and practice" of shielding the President from dissent. *Moss I* held that the pattern and practice allegation in the FAC, "without *any* factual content to bolster it, is just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate." *Moss I*, 572 F.3d at 970. The SAC provides this additional factual content.

The SAC provides twelve detailed allegations, relying on published reports, of similar instances of viewpoint discrimination against protestors expressing negative views of the President. For example, during a speech given by President Bush, those expressing critical views of the President were sequestered approximately "one-third of a

mile away from where [he] was speaking," while those supporting the President were permitted "to stand alongside the motorcade route right up to where the President" was located.

In addition, the SAC alleges that a policy and practice of suppressing criticism of the President is set forth in the Presidential Advance Manual, a redacted copy of which was attached to the complaint. The Advance Manual directs the President's advance team to "work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, *preferably not in view of the event site or motorcade route.*"[4] (emphasis added). Removal of protestors opposed to the President, is, of course, precisely what the anti-Bush protestors allege happened to them. While the Advance Manual is designed to guide the President's political advance team, not the Secret Service, it itself suggests that the Secret Service may play a part in ensuring that protestors are contained to an area away from the President. Furthermore, the protestors allege that, in this instance, because of the sudden change in the President's plans, the advance team had insufficient time to "suppress the protest. Instead," they "relied on the Secret Service to do so."

The protestors' allegations that the agents' conduct in this case accords with viewpoint discriminatory practices instituted in other, similar, circumstances and encouraged by

---

[4] It is clear from the context that the manual is referring only to demonstrators opposed to the President. The following paragraph, for example, suggests that while demonstrators ought to be moved to a protest area out of view of the event or motorcade route, "rally squads" of supporters "countering" the protestors' message ought to be strategically placed in view of the media.

the President's Advance Manual support the plausibility of the inference that, in this case, the Secret Service agents directed that the anti-Bush protestors be moved because of their viewpoint.

In sum, the anti-Bush protestors have pleaded nonconclusory factual allegations that they were treated differently than the pro-Bush demonstrators; that any security-based explanation for this differential treatment offered by the Secret Service agents was pretextual; and that the agents' directives in this case accord with a pattern of Secret Service action suppressing the speech of those opposed to the President.[5]  These allegations, taken together, are sufficient to allow the protestors' claim of viewpoint discrimination to proceed.

## 2.

Even if they acted unconstitutionally, the Secret Service agents are entitled to qualified immunity unless the "contours" of the First Amendment right they violated were "sufficiently clear that a reasonable official would understand

---

[5] The SAC also contains allegations that there were bystanders at the Inn where the President ate who were neither screened for weapons nor required to move farther from the President.  The presence of these unscreened bystanders, the protestors argue, is further evidence that the security rationale offered by the Secret Service agents was pretextual.  The agents argue that we are foreclosed, on law of the case grounds, by our previous decision in *Moss I* from considering the way in which the agents treated bystanders at the Inn.  Whether this is so is a difficult question. Because we hold that the protestors other allegations are sufficient to support a plausible claim of viewpoint discrimination, we do not decide at this juncture whether *Moss I* prevents us from considering the protestors' bystander allegations.

that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal quotations and citations omitted). The Secret Service agents contend that even if the protestors have established a plausible claim of viewpoint discrimination, they have failed to demonstrate "that the right they claim was infringed was clearly established in the specific context at issue here." They characterize the qualified immunity question as whether

> every reasonable officer . . . would have understood that moving the [anti-Bush protestors] only a half block farther from the President than his supporters were located constituted viewpoint discrimination in violation of the First Amendment.

This statement inaccurately characterizes both the protestors' allegations and the governing law.

First, as a factual matter, the parties contest the relevant distances. The protestors allege that they were moved over a block farther from the Inn than the pro-Bush demonstrators. Further, although the agents repeatedly characterize the locations of the pro- and anti-Bush protestors as "comparable," we have already noted that based on the facts alleged, there are relevant ways in which the distances were not comparable.

In addition, the Secret Service agents focus solely on the distance between the protestors and the President while he was dining. They do not address the allegation that the pro-Bush demonstrators were permitted to remain along the President's motorcade route, while the anti-Bush protestors were kept away. This additional discrepancy is quite relevant

in assessing whether a reasonable agent could have believed the direction to relocate the anti-Bush protestors was consistent with the First Amendment.

More fundamentally, the protestors' claim is not simply that they were moved, but that they were relocated *because* they criticized the President. The protestors allege that if the agents asserted a security rationale for moving the protestors, that rationale was false. That is, they allege that the agents' action was both facially discriminatory *and* driven by an improper motive. We must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Therefore, taking the protestors' allegation of discriminatory motive as true, it is clear that no reasonable agent would think that it was permissible under the First Amendment to direct the police to move protestors farther from the President because of the critical viewpoint they sought to express.

The agents suggest that because there are no cases with similar fact patterns, a reasonable agent could not have known that their conduct was unconstitutional. But the denial of qualified immunity does "not require a case directly on point." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Rather, it requires that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* It is "beyond debate" that, particularly in a public forum, government officials may not disadvantage speakers based on their viewpoint.

As decades of Supreme Court doctrine make clear, "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828 ; *see, e.g.*, *R.A.V.*, 505 U.S. at 391-92*; Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95–96 (1972); *see also Metro Display Adver. v. City of Victorville*, 143 F.3d 1191, 1195 (9th Cir. 1998). The "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views," for "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95–96. Indeed, in a case closely on point, the D.C. Circuit held in *Mahoney v. Babbitt* that the government could not grant permits to demonstrate along the Inaugural Parade route to those supportive of the President and refuse permits to those opposed. 105 F.3d 1452, 1459 (D.C. Cir. 1997).

The anti-Bush protestors have plausibly alleged that the Secret Service agents acted *with the sole intent* to discriminate against them because of their viewpoint; this intent can never be objectively reasonable. After discovery or trial, the evidence could demonstrate that the agents did not, in fact, act with viewpoint discriminatory intent or that, notwithstanding some discriminatory motivation, they acted with the primary intent to protect the President and therefore would have taken the same actions absent any discriminatory motive. In that case, they are, of course, free to renew their qualified immunity motion. *See Behrens v. Pelletier*, 516 U.S. 299, 306 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). However, the agents are not entitled to qualified immunity at this stage.

*   *   *

As this case arises on a motion to dismiss, any explanation for the agents' differential treatment of the pro- and anti-Bush demonstrators would have to be so obviously applicable as to render the assertion of unconstitutional viewpoint discrimination implausible. The Dissent from the Denial of Rehearing En Banc ("En Banc Dissent") maintains otherwise, so we briefly respond to its analysis:

Our opinion makes clear that there is simply *no* apparent explanation for why the Secret Service agents permitted only the pro-Bush demonstrators, and not the anti-Bush protestors, to remain along the President's after-dinner motorcade route, *see* Op. at 1225, 1228; the En Banc Dissent suggests none. And the explanation proffered in the En Banc Dissent for the agents' actions in moving the anti-Bush demonstrators in the first place — namely that the pro-Bush demonstrators were not moved because they were ostensibly further than the protestors from the patio where President Bush was dining, *see* En Banc Dissent at 14 — is not a basis for granting the agents qualified immunity at the pleadings stage, for several reasons:

First, the En Banc Dissent's speculative explanation is non-responsive to the protestors' viewpoint discrimination claim. The question is not why the agents moved the anti-Bush protestors *somewhere*, but rather why the agents moved the protestors a considerable distance, to a location that, as we have explained, was in "relevant ways . . . not comparable" to the place where the pro-Bush group was allowed to remain. *See* Op. at 1228. No "tape[] measure" is required, *see* En Banc Dissent at 12, to appreciate that demonstrators separated by more than a full square block, and two roadways, from the

public official to whom and about whom they wish to direct a political message will be comparatively disadvantaged in expressing their views. Nor does one need a noise dosimeter to know that the President will be able to hear the cheers of the group left alongside his travel route but unable to hear the group restricted to an area about two square blocks away.

Perhaps there was a reason for the considerable disparity in the distance each group was allowed to stand from the Presidential party — for example, traffic, or an obstruction on the square block adjacent to the Inn, requiring that the anti-Bush demonstrators be moved more than a block further away. But, as matters now stand, nothing in the En Banc Dissent's entirely hypothetical "explanation is so convincing" as to render "*im*plausible" the plaintiffs' claim of viewpoint discrimination. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012). It is therefore premature at this stage to credit the En Banc Dissent's theory instead of the protestors'. *See id.* For the same reason, the En Banc Dissent's assertion, *see* En Banc Dissent at 12, that the panel has "second[] guess[ed]" the Secret Service agents' judgment about how best to protect the President fails to account for the fact that at this stage of the case, the record is devoid of *any* explanation for the substantial difference in where the two groups of demonstrators were allowed to stand relative to the President's locations.

Finally, the En Banc Dissent's invocation of the case law upholding certain buffer zones, *see id.* at 22, actually illustrates well why the complaint *does* establish a plausible claim of a violation of clearly established law regarding impermissible viewpoint discrimination in a public forum. Such buffers have been upheld *only*, and expressly, on the

understanding that the restrictions are content and viewpoint neutral. For example, in *Hill v. Colorado*, 530 U.S. 703 (2000), the Supreme Court upheld the buffer zone ordinance there at issue only after emphasizing that it applied "to all 'protest,' to all 'counseling,' and to all demonstrators whether or not the demonstration concerns abortion, and whether they oppose or support the woman who has made an abortion decision. That is the level of neutrality that the Constitution demands." *Id.* at 725. Had the ordinance in *Hill* established a one-hundred foot buffer zone for pro-abortion demonstrators and a three-hundred foot buffer zone for anti-abortion protestors, there is no doubt such a viewpoint discriminatory ordinance would have been summarily invalidated.

The protestors here plausibly allege just such a significant *difference* in the buffer zone in a public forum. And *Hill* was, of course, decided before the events in this case. The protestors therefore allege a plausible case of impermissible viewpoint discrimination as of the time this case arose.

## C. Fourth Amendment

To succeed on their Fourth Amendment claim, the protestors must allege facts from which we could plausibly infer: (1) that excessive force was used against them; (2) that the law at the time of the protest clearly established that the force used was unconstitutionally excessive; and (3) that even though they were not present at the demonstration, Superintendent Ruecker and Captain Rodriguez played a sufficient role in the use of excessive force that they may be held liable for it. While the protestors' allegations are sufficient to support a claim of excessive force and to deny qualified immunity to those who might be liable for the use

of that force, they have pleaded no facts that would allow us to make a plausible inference that Ruecker and Rodriguez were in any way involved in the use of excessive force such that they may be held liable for it.

**1.**

Fourth Amendment claims of excessive force are evaluated according to the framework established by *Graham v. Connor*, 490 U.S. 386 (1989). *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1053-54 (9th Cir. 2007). Under *Graham*,

> [d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

*Graham*, 490 U.S. at 396 (internal quotation marks and citations omitted). *Graham* cautioned that reasonableness is to be judged not "with the 20/20 vision of hindsight," but "from the perspective of a reasonable officer on the scene." *Id.*

We first "assess the quantum of force used" and then "measure the governmental interests at stake by evaluating a range of factors," including: (1) "the severity of the crime at issue"; (2) the extent to which "the suspect poses an immediate threat to the safety of the officers or others"; (3) and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Davis*, 478 F.3d at 1054

(internal quotation marks and citations omitted). In considering whether, from the perspective of an officer on the scene, "the totality of the circumstances justifie[d]" the force used, additional factors may also be relevant. *Forrester v. City of San Diego*, 25 F.3d 804, 806 n.2 (9th Cir. 1994). For example, we may look to the alternatives available to the officer at the time. *See Davis*, 478 F.3d at 1054.

There is little doubt that under this framework, the force alleged here was excessive. The protestors allege that without ensuring that they heard the police warning that instructed them to move, and without giving them time to move of their own accord, the police, "including officers clad in riot gear, forced the anti-Bush demonstrators to move . . . , in some cases by violently shoving" them, "striking them with clubs and firing pepper spray bullets at them." Once on the east side of Fifth Street, the police "divided the [anti-Bush protestors] into two groups, encircling each group," and "separat[ing]" families, "including children, some of whom were lost, frightened and traumatized." Although some protestors attempted to leave the area, they were prevented from doing so.

To be sure, the government interest at stake – the protection of the President – is of the highest significance. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). However, an examination of the *Graham* factors indicates that the force used was excessive even to protect this interest.

"[T]he most important single element" of the *Graham* framework is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates,* 27 F.3d 1432, 1441 (9th Cir. 1994). There is no indication that the anti-Bush protestors posed such a threat to the

President, the police officers, or anyone else. The SAC alleges that the protestors were not close enough to the President to harm him and that their protest was entirely peaceful.

The other two *Graham* factors also favor the protestors. They were not committing, and had not committed, any crime. Instead, they were engaging in a peaceful demonstration, the location and timing of which had previously been approved by local police. Nor is there any indication that they were disobeying the commands of the officers or resisting in any way.

Furthermore, it is a plausible inference from the facts alleged that there were less harmful alternatives available that a reasonable officer on the scene should have considered. According to the SAC, the police did not attempt to contact the protest's organizers, whose contact information they had, nor did they give the group sufficient notice or time to move on their own before being forcibly moved.

The protestors allege that the police used violent physical force and pepper spray on a group of obedient, peaceful protestors. As compared to similar cases, the force used was at least as violent, with no greater justification. For example, we held in *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1131 (2002), that the use of pepper spray against peaceful protestors, even when those protestors linked themselves together and refused to release the locks, was unreasonable. In *P.B. v. Koch*, 96 F.3d 1298, 1304 (9th Cir. 1996), we held that "slapping, punching, and choking" students when there was no reason to use force was excessive. Under these precedents, the protestors' allegations indubitably support a plausible claim of excessive force.

As the cases just discussed indicate, the unreasonableness of this use of force was clearly established at the time of the protest. That conclusion is inescapable even if we focus only on one aspect of the force used. The protestors allege that the police officers used pepper spray bullets, even though the demonstrators were peaceful and cooperative. It was clearly established at the time of the protest that the use of pepper spray on an individual who is already under control constitutes excessive force in violation of the Fourth Amendment. *See Headwaters Forest Def.*, 276 F.3d at 1130; *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000).

**2.**

The protestors have not, however, provided sufficient allegations to establish a plausible claim against Ruecker and Rodriguez, in particular, for the use of the excessive force. Ruecker and Rodriguez were not on the scene at the time of the demonstration, but they were the supervisors of the officers who were on the scene. Supervisors may not be held liable under § 1983 for the unconstitutional actions of their subordinates based solely on a theory of respondeat superior. *Iqbal*, 129 S. Ct. at 1948.

We recently summarized the circumstances under which supervisors may be held liable under § 1983 as follows:

> (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training,

supervision, or control of subordinates; (3) for
acquiescence in the constitutional deprivation
by subordinates; or (4) for conduct that shows
a "reckless or callous indifference to the rights
of others."

*al-Kidd*, 580 F.3d at 965 (quoting *Larez v. City of L.A.*,
946 F.2d 630, 646 (9th Cir. 1991)).[6]  The SAC is inadequate
to establish that any of these circumstances apply here.  The
allegations regarding Ruecker and Rodriguez's role in the use
of excessive force are conclusory; none is supported by
sufficient – or, for that matter, any – factual content that
would allow it to meet the pleading standard articulated in
*Iqbal*.

First, the protestors allege that Ruecker, as
"Superintendent of the Oregon State Police" was "responsible
for directing the operations of the Oregon State Police and
supervising the law enforcement officers and agents acting
under his authority."  Similarly, they allege that Rodriguez,
as Captain of the Southwest Regional Headquarters of the
Oregon State Police, was "responsible for directing the
operations of said Headquarters and supervising the law
enforcement officers and agents acting under his authority."
These allegations are merely recitations of the *organizational*
role of these supervisors.  The protestors make no allegation

---

[6] *Al-Kidd* was decided after *Iqbal*.  The extent to which its supervisory
liability framework is consistent with that decision and remains good law
has been debated.  *See, e.g.*, *Al-Kidd*, 598 F.3d at 1141 (O'Scannlain, J.,
dissenting from denial of rehearing en banc); *see also Bayer v. Monroe
Cnty. Children & Youth Servs.*, 577 F.3d 186, 191 n.5 (3d Cir. 2009);
*Maldonado v. Fontanes*, 568 F.3d 263, 274 n.7 (1st Cir. 2009).  Because
the protestors do not allege sufficient facts to meet the standard set forth
in *al-Kidd*, we need not consider that debate.

that the supervisors took any specific action resulting in the use of excessive force by police officers on the scene of the anti-Bush demonstration.

We have "never required a plaintiff to allege that a supervisor was physically present when the injury occurred." *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). But § 1983 plaintiffs nevertheless must allege *some* "culpable action or inaction" for which a supervisor may be held liable. *Larez*, 946 F.2d at 645. In an effort to meet this requirement, the protestors allege that Rodriguez "and other individual State and Local Police Defendants," including, we assume for present purposes, Ruecker, "personally directed and approved of the actions of the police." But they do not specify which actions Ruecker or Rodriguez directed and approved. In particular, they do not allege that the supervisors directed or approved the tactics – the shoving, use of clubs, and shooting of pepper spray bullets – employed by the officers in moving the protestors.

Finally, the protestors claim that "the use of overwhelming and constitutionally excessive force against them" was "the result of inadequate and improper training, supervision, instruction and discipline . . . under the personal direction . . . of the State and Local Police Defendants." However, this allegation is also conclusory. The protestors allege no facts whatsoever about the officers' training or supervision, nor do they specify in what way any such training was deficient.

The protestors' reliance on *Connick v. Thompson*, 131 S. Ct. 1350 (2011), is misplaced. *Connick* reaffirmed the possibility – left open in *Canton v. Harris*, 489 U.S. 378 (1989) – that there are circumstances in which a need for

training is so obvious that a city that fails to provide it may be held to have been deliberately indifferent even without a pattern of constitutional violations by city employees. *Id.* at 1361 (citing *Canton*, 489 U.S. at 390 n.10). This concept is inapposite here. There is no debate in this case about the need for training police officers on the constitutional use of force. The questions here are whether any such training they received was deficient, and, if so, whether the defendant police supervisors were responsible for that deficiency. The protestors have alleged no facts that would demonstrate either.

We hold that the protestors have not pleaded sufficient allegations to support a claim of excessive force against Ruecker and Rodriguez. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. It is possible, however, that the complaint could be saved by amendment. Because the district court held that the SAC was sufficient to state a claim against the police supervisors, it did not, of course, consider whether the protestors ought to be given leave to amend to cure any deficiencies. For us to decide that question, ordinarily addressed to the district court's sound discretion, *see, e.g.*, *Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980), would be to usurp the district court's authority. *Cf. Iqbal v. Ashcroft*, 574 F.3d 820, 821 (2d Cir. 2009). We therefore remand to the district court for dismissal of the protestors' excessive force claim and for a determination in the first instance of whether the protestors ought to be given leave to amend their complaint.

### III. Conclusion

In sum, we hold that the protestors have alleged a plausible First Amendment claim and that Agents Wood and Savage are not, at this time at least, entitled to qualified immunity. We therefore **AFFIRM** the district court's ruling, denying the Secret Service agents' motion to dismiss that claim. However, we hold that the protestors have not alleged sufficient facts to support a plausible Fourth Amendment claim against police supervisors Ruecker and Rodriguez. Therefore, we **REVERSE** the district court's denial of the supervisors' motion to dismiss and **REMAND** to that court with instructions to dismiss protestors' Fourth Amendment claim and to determine whether the protestors ought to be given leave to amend.

# Appendix



KEY NOTES

RELATIVE DENSITY OF PEOPLE

Ⓐ PRO-BUSH DEMONSTRATORS

Ⓑ ANTI-BUSH DEMONSTRATORS

Ⓒ DIRECTION OF TRAVEL FROM ALLEY

SITE PLAN
SCALE: 1" = 50'-0"
NORTH

EXHIBIT A TO SECOND AMENDED COMPLAINT
Page 1 of 1